[No. 42299.    En Banc.    January 25, 1973.]

VIRGINIA EGGERT *et al., Respondents,* v. THE CITY OF SEATTLE *et al., Appellants.*

*A. L. Newbould* and *E. Neal King,* for appellants.

*Jackson, Goldmark & Bender* and *Jeffrey H. Brotman,* for respondents.

UTTER, J.—Respondents challenged certain provisions of the Seattle City Charter granting preference in employment for some positions to those who have been residents of the city, or in the case of respondent Eggert, residents of the county, for at least 1 year. The trial court found the challenged provisions unconstitutional and granted respondents' request that they be allowed to compete on an equal basis with all other applicants for the civil service positions at issue. The city appeals.

The claim of respondents is that durational residency requirements infringe upon their constitutionally protected right to travel and that the charter provisions further violate the equal protection clause of the Fourteenth Amendment. The sole issue is whether the City of Seattle may lawfully impose a 1-year durational residency requirement upon applicants for civil service positions who are otherwise valid residents of the municipality. We hold they may not and affirm the trial court.

Concern over the right to travel has historically been a concern of both English and American people. The recognition of the importance of freedom of movement ranges from the declaration in the Magna Charta allowing every free man to leave England except during wars, to article 13, section 1 of the Universal Declaration of Human Rights of the United Nations which declares "Everyone has the right to freedom of movement and residence within the borders of each State."

The growth of this right is in part the result of efforts to evade restrictions imposed by feudal apprenticeship and paupership laws in 17th century England. By the time of the American Revolution, restrictions by England, on travel west of the Alleghenies was a source of grievance sufficient to be the cause of denunciation from the Continental Congress. Z. Chafee, Jr., *Three Human Rights in the Constitution* 162 (1956).

The Articles of Confederation provided in article 4 that "the people of each State shall have free ingress and regress to and from any other State." The constitution, however, failed to specifically enumerate a right to travel. Boudin, *The Constitutional Right to Travel*, 56 Colum. L. Rev. 47 (1956).

Perhaps the earliest enunciation of the right to travel was in *Corfield v. Coryell*, 6 F. Cas. 546 (No. 3230) (C.C.E.D. Pa. 1823). There Justice Washington, enumerating those rights he felt to be fundamental, noted at page 552:

> The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise . . . may be mentioned as [one] of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental . . .

In the Passenger Cases, 48 U.S. (7 How.) 282, 492 (1849), Chief Justice Taney, in a dissent, commented that freedom to travel is an incident of national citizenship. This dissent is quoted with approval in *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35 (1867), where the United States Supreme Court based the right to travel upon a constitutional requirement that all citizens have free access to the seats of government.

Modern development of the doctrine began with *Edwards v. California*, 314 U.S. 160, 86 L. Ed. 119, 62 S. Ct. 164 (1941), where the court held a law denying assistance to nonresident indigents entering the state was an impermissible burden on interstate commerce. A concurring opinion by Mr. Justice Douglas attributed the source of the right to travel as "an incident of *national* citizenship" and was an implied right "fundamental to the national character of our Federal Government." A second concurring opinion by Mr. Justice Jackson, assigned the source of the right to the privileges and immunities clause of the Fourteenth Amendment.

In *Kent v. Dulles*, 357 U.S. 116, 2 L. Ed. 2d 1204, 78 S. Ct.

1113 (1958), the due process clause of the Fifth Amendment was cited as a source of the right to travel. The court, in dictum, recognized "Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage." The same source for the right was cited by the court in *Aptheker v. Secretary of State,* 378 U.S. 500, 517, 12 L. Ed. 2d 992, 84 S. Ct. 1659 (1964), where the court premised its decision on tne right to travel. Freedom of travel was stated to be a liberty guaranteed by the Fifth Amendment and, as well, "a constitutional liberty closely related to rights of free speech and association . . ."[1]

The right to travel was given further scope in *United States v. Guest,* 383 U.S. 745, 757, 16 L. Ed. 2d 239, 86 S. Ct. 1170 (1966), where the court expanded its protection to incidents involving private individuals. The majority noted:

> The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized. . . .
>
> . . .
>
> Although there have been recurring differences in emphasis within the Court as to the source of the constitutional right of interstate travel, there is no need here to canvass those differences further. All have agreed that the right exists.

(Footnote omitted.) The court further stated, in note 17:

> The right to interstate travel is a right that the Constitution itself guarantees . . . the right to travel freely

[1] An interpretation of the right to travel which would hold it comparable to First Amendment rights has been urged. The argument is that, inasmuch as freedom to gather information and of assembly depends on freedom to travel, travel should also receive the same degree of protection as the First Amendment. This could arguably lead to a right to challenge a restriction to travel on its face without showing personal injury from the law. If, in fact, it is related to First Amendment rights, a compelling state interest could be shown only by a clear and present danger to public safety. Comment, *The Right to Travel and its Application to Restrictive Housing Laws,* 66 N.W.L. Rev. 635, 641 (1971).

from State to State finds constitutional protection that is quite independent of the Fourteenth Amendment.

*Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969), adhered to *Guest* in declining to ascribe the right to travel to any particular provision of the constitution. The court did, however, at one point apply an equal protection analysis, finding infringement of a fundamental right of interstate movement and requiring a showing of a compelling state interest to justify the infringement. In another part of the opinion, the court rejected a rational relationship argument by the state and held, where by traveling the parties were exercising a constitutional right, "any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional."

In *Dunn v. Blumstein*, 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995 (1972), the court again recognized the status of the right to travel as a fundamental right protected by the equal protection clause of the Fourteenth Amendment where it stated, "The constitutional question presented is whether the Equal Protection Clause of the Fourteenth Amendment permits a State to discriminate in this way among its citizens." The protection of the right by the constitution itself is also recognized by the majority in *Dunn*, where citing Justice Stewart's concurring opinion in *Shapiro*, it noted "The right to travel is 'an *unconditional* personal right,' a right whose exercise may not be conditioned." Justice Stewart had, in *Shapiro*, emphasized that travel is an established constitutional right, not a mere conditional liberty subject to regulation and control under conditional due process or equal protection standards.

As also noted in *Dunn v. Blumstein, supra,* to decide whether a law violates the equal protection clause, the court must look to three things: (1) the character of the classification in question, (2) the individual interests affected by the classification, and (3) the governmental interests asserted in support of the classification. We hold

that, in the instant case, respondents' right to equal protection of the law has been violated.

■ The City of Seattle's charter, classifying bona fide residents upon the basis of recent travel, penalizes only those residents who have traveled into the city during the qualifying period. As such, it is a classification which affects a fundamental right involving a protected individual interest, and under *Shapiro* and *Dunn*, the city must show a compelling state interest to justify its action.

■ Alternately, since the existence of the right to travel is an unconditional personal right guaranteed by the constitution, *Shapiro* and *Dunn* require that a compelling state interest be shown before the state may burden this right.

The right to travel is a right applicable to intrastate as well as interstate commerce. Inasmuch as the right to travel is not based on the commerce clause, it does not depend on the interstate nature of travel. *King v. New Rochelle Municipal Housing Authority*, 314 F. Supp. 427 (S.D.N.Y. 1970); *Karp v. Collins*, 310 F. Supp. 627, 634 (D.N.J. 1970). Rights, such as the right to travel, which involve personal liberty are not dependent on state lines. Both travel within and between states is protected.

The city attempts to justify its actions by arguing that the court, in a note in *Shapiro*, indicated its decision there did not, per se, invalidate the validity of waiving a residence requirement, determining eligibility to vote, etc. As stated in *Shapiro v. Thompson, supra*, n.21:

> We imply no view of the validity of waiting-period *or* residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession, to hunt or fish, and so forth. Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel.

Much of the difficulty posed by the note involves a determination of what protected travel is.

The seeming conflict between the holding of *Shapiro* and note 21 was commented on in *Cole v. Housing Authority,* 435 F.2d 807 (1st Cir. 1970). There the court indicated the use of the word "travel" in *Shapiro* was in the sense of migration with intent to settle and abide, and that, therefore, laws disadvantaging persons traveling to take advantage of state benefits and then leaving are permissible. The court noted, at page 811:

> For example, [in *Shapiro*] the Court suggested that residency is a reasonable requirement for eligibility to receive welfare benefits but that the one-year waiting period was unconstitutional. . . . Any residency requirement might be thought to penalize the right to travel if "travel" is used in the sense of movement. A resident of Maine vacationing for a month in New Hampshire might be penalized for traveling if he could not obtain the benefits of a library card in New Hampshire during his vacation. Nevertheless, a residency requirement so "penalizing" that kind of travel is probably permissible under *Shapiro*.
>
> Under this reading of *Shapiro,* we need only to ask if the two-year residency requirement penalized persons because they have recently migrated to Newport.

(Footnote omitted.)

Two lower court decisions prior to *Dunn* upheld the power of a state to impose higher tuition upon nonresident students. *Starns v. Malkerson,* 326 F. Supp. 234 (D. Minn. 1970), *aff'd mem.,* 401 U.S. 985, 28 L. Ed. 2d 527, 91 S. Ct. 1231 (1971); *Kirk v. Board of Regents,* 273 Cal. App. 2d 430, 78 Cal. Rptr. 260 (1969), *appeal dismissed per curiam,* 396 U.S. 554, 24 L. Ed. 2d 747, 90 S. Ct. 754 (1970). *Starns* relies heavily upon *Kirk* for its holding.

The court in *Starns,* using an equal protection analysis only, distinguishes *Shapiro* on two grounds by first noting that there the waiting period had as a specific objective the exclusion of the poor who needed or who might need relief, and thereby served as a constitutionally impermissible purpose for the classification, while in the tuition cases the residence requirements did not have the purpose or effect

of excluding or deterring nonresident students from attending the university. Secondly, the court in *Starns* held the denial of lower resident tuition rates did not endanger the health or life of the applicants as the denial of welfare benefits did in *Shapiro*, and therefore no fundamental right was infringed upon and the compelling state interest test did not apply.

The decision in *Dunn* makes clear that the right to travel is, as a fundamental right, violated by classifications which penalize, not actually deter the right to travel, and that actual deterrence was not a factor to be considered in deciding whether a penalty was imposed. *See also Vaughan v. Bower*, 313 F. Supp. 37 (D. Ariz. 1970), *aff'd*, 400 U.S. 884, 27 L. Ed. 2d 129, 91 S. Ct. 139 (1970). The *Starns* decision did hold there was no penalty on the right to travel, and we do not comment on that finding as that question is not before us. It is clear, however, that in the case before us the durational residency requirement does penalize recent travel by completely and unconditionally depriving those recently migrated to the city, regardless of their status as bona fide residents, of the right to apply for employment. The city argues that its residency provisions cannot be said to impose a penalty on the right to travel inasmuch as even if respondents were to have the right to apply for employment, they could not be guaranteed work.

The city's argument that respondents are not penalized, inasmuch as they could not be guaranteed employment, even if eligible, misconstrues the claimed penalty. Respondents are seeking to preserve the right to compete for employment on an equal basis with all other city residents. The denial of their applications on durational residency grounds is a clear penalty. It is even more oppressive when the positions sought by two respondents as park and recreational supervisors are substantially unavailable in the private sector of employment.

Respondents argue that the right to seek gainful employment is a fundamental right which requires a compelling

state interest be shown to justify classifications which discriminate against it. *Truax v. Raich*, 239 U.S. 33, 60 L. Ed. 131, 36 S. Ct. 7 (1915); *Keenan v. Board of Law Examiners*, 317 F. Supp. 1350 (E.D.N.C. 1970); *Purdy & Fitzpatrick v. State*, 71 Cal. 2d 566, 456 P.2d 645, 79 Cal. Rptr. 77 (1969). We need not decide whether or not the right to seek gainful employment has risen to the level of a fundamental right, since the compelling state interest test is still required by the penalty on the right to travel.

It is further argued that inasmuch as the city is not the only employer, the rights denied are not uniquely governmental as are welfare benefits or voting, and that *Dunn* and *Shapiro* therefore do not apply. Nowhere in the majority opinions in either *Dunn* or *Shapiro* is the distinction made between rights which are uniquely governmental and those which are not, and the consequent applicability of the right to travel. On the contrary, in *United States v. Guest*, 383 U.S. 745, 16 L. Ed. 2d 239, 86 S. Ct. 1170 (1966), the court held that the right to travel can be protected from interference by private individuals as well as by state and federal governments.

The city offers no argument that it has a compelling state interest to justify the durational residency requirement. Without such an interest, the requirement violates both the equal protection clause of the Fourteenth Amendment and the respondents' constitutional right to travel.

Judgment affirmed.

FINLEY, ROSELLINI, HAMILTON, STAFFORD, and WRIGHT, JJ., concur.

HALE, C.J. (dissenting)—I dissent because I am unable to find anything, express or implied, in the Constitution of the United States or the Constitution of the State of Washington which makes this long-standing provision of Seattle's charter unconstitutional and void. Before a court declares void a statute or city charter, it bears the heavy responsibilities of demonstrating in what respects the voided law is repugnant to either state or federal constitution and of

pointing out which particular section, clause or phrase is violated.

The people of this country have elected to live and govern themselves under written constitutions. Rather than vest the overwhelming powers of government in an omnipotent parliament, they have sought to seal in writing their own ultimate sovereignty and to describe the powers of and limitations upon their governments, national, state and local, in words and phrases, and in writing have enumerated guarantees for the freedom of the individual. I think we should abide by the constitutions as they have been written. Where a legislative enactment is challenged, the courts, before striking it down, must find a recognizable connection between the language of the constitutions and the principles of constitutional law upon which the enactment is to be declared void. Any different theory repudiates the concept of a written constitution, and on final analysis places the ultimate power of amendment in the judiciary instead of in the people where it belongs.

I thus disagree with the opinion in this case because it portends the formless shape of the constitutions to come, auguring a time when the basic charters of government will be neither written nor read but largely surmised at and when they will consist almost entirely of a mass of shifting judicial precedents, frequently conflicting, sometimes incomprehensible, and occasionally unconstitutional. If we adhere to the idea that ours is a government of written powers and written limitations, recognizing too that many of these are necessarily implied from those explicitly enumerated, nothing can be found in either constitution or reasonably implied therefrom forbidding the people of Seattle from requiring applicants for the city civil service to reside there for at least 1 year before acquiring eligibility to the civil service.

The court declares void this long-standing provision of the charter, not because it violates any enumerated constitutional rights or privileges or those to be implied therefrom, nor because it exceeds any of the declared powers of

city government, nor is ultra vires, nor abridges any of the individual rights and privileges declared by statute, but on the ground that it abrogates what the courts refer to as freedom of travel—a freedom not specified in either constitution. It ignores the proposition that nearly all laws which require one to be at or exclude him from a given place at a particular time similarly in one degree or another impair his freedom of travel.

There is nothing in either constitution which insures, or in the charter which abridges, freedom of travel—for neither document mentions the subject. Whatever connection exists between travel rights and these basic charters of government is, therefore, purely coincidental. The people did not initially include in the constitution this untrammelled right, probably because they did not wish to subordinate the whole fabric of constitutional government to so nebulous and overriding an idea.

How does this mundane 1-year residency requirement for civil service employment develop intellectually into an unconstitutional abridgement of freedom of travel when no words can be found in either charter or constitution conveying such a concept? Thousands of people enter and leave Seattle daily by land, sea and air and, aside from the obvious hazards of traffic and the impediments of congestion and economics, they must be oblivious of this impairment of their travel rights. And if any traveler entering or leaving Seattle were to assume that the charter had impaired his freedom of travel, what parts of the charter would have to be repealed in order to have his rights restored? One has to conclude to the contrary, I think, that Seattle's civil service, engaged as it is in regulating, building and maintaining the roads, streets, bridges, way stations and vehicles for public transportation, not only does not abridge but instead contributes substantially to the ease and safety of travel and the comfort of travelers.

To establish and maintain a competent and capable civil service, fairly administered and devoted to the progress and welfare of the community, involves many factors, and

a reasonable period of residence within the city, I think, is one of them. When an applicant has lived there for a year it is much easier and less expensive to verify the information set forth in his application for a civil service position. Then, too, residence in a community for a year provides some evidence of good faith; it enables the applicant to establish an identity with the city, and encourages him to stake his future and that of his family to its progress and welfare. The majority impliedly concedes this in ruling that *some* period of residence is not unconstitutional but that a 1-year period is. Since, as the court now holds, there is nothing unconstitutional about requiring applicants to be bona fide residents in the first place, one is hard put to find out why the court holds in the second place that 1 year is an impairment of the right to travel but a lesser period is not. Thus, I think the court, in voiding the charter's residence requirement, has not asserted a principle of constitutional law but simply substituted its judgment for that of the people of Seattle on a purely legislative matter—a legislative judgment exercised by the people in their legislative capacity to decide what minimum time shall be reasonable. I would conclude, therefore, on this point, that it is the court's opinion which is unwarranted by the constitution, not the Seattle charter.

The actual provisions which the court now finds contravene the Fourteenth Amendment, the Magna Carta, and the unwritten right to travel are set forth in the Seattle charter, 1 Seattle, Wash., Code art. 16, § 6:

All applicants for offices or places in the classified civil service shall be subject to examination, which shall be public, competitive, and open to all citizens of the United States with specified limitations as to residence, age, health, habits, and moral character . . . *Preference in employment shall at all times,* subject to such examination, *be given to citizens of the United States and residents of the city for one year.*

(Italics mine.) 1 Seattle, Wash., Code art. 16, § 8, in pari materia, provides for a register to be compiled from the

examination returns and reports showing the standing of civil service applicants and then states:

Provided, That, as among persons qualified by examination under the provisions of this article, persons who have been residents within the city for at least one year immediately preceding appointment and regular civil service employees who are required to reside outside the city in connection with their employment, shall be placed at the head of the list of eligibles in the order of their standing upon examination and shall be accorded preference in original appointment.

The Seattle charter says nothing about travel; it provides merely that applicants for jobs in the civil service be bona fide residents of the city and demonstrate this by being there for a year. On its face, this appears to be a simple garden-variety measure for local self-government, but if, as the court fears, it masks an insidious attack on many of the things free men hold dear, including the sacred and enduring principles of liberty implicit in the Magna Carta, the Bill of Rights and the Fourteenth Amendment, this nefarious design is well hidden in what has come to be usual and mundane city charter language. At this reading, the provision on residence still seems no more than a standard clause of universal municipal usage throughout the country, designed to do no more than lay down the simple and easily complied with requirement that, before a person can become a member of the Seattle civil service, he should live there for at least 1 year.

This provision which the court finds unconstitutional appears to me to be one common to most municipal charters in the nation. Nowhere does it convey to me or remotely accomplish the sinister implication which the court finds buried there that, in establishing and maintaining a civil service system, the people intended to impair, abridge or defeat the right to travel. *See* Seattle charter, 1 Seattle, Wash., Code art. 16, § 6. Nor do I share the court's fears that the people of Seattle in adopting their charter abrogated the long-cherished principles of the Magna Carta, circa 1215, and established and perpetuated a municipal

government on principles repugnant to the Bill of Rights or the Fourteenth Amendment or the state constitution. Their sole ambition, I think on the point in issue was to do no more nor less than establish and maintain a sound civil service system. Whatever earthshaking consequences may exist in Seattle's charter concerning the civil service appear to me to be expressed in the run-of-the-mill, mundane terminology of city charters generally. It requires a judicial prescience beyond the ordinary to discover a design to strip the people of Seattle and those entering and leaving it of liberties stemming from the Magna Carta and incorporated into our constitutions.

If a residence requirement abridges the freedom of travel, why also do not the requirements that an applicant traveling through must digress from his intended route of travel, stop in Seattle, obtain an application, take an examination, and remain available for the results and appointment? Should the court adhere to the rationale of this case, it will be forced to declare that the civil service itself is as much a burden on freedom of travel as is the residence requirement. Why is it, therefore, constitutional to have a civil service at all? And, if a year's required residence unconstitutionally impairs freedom of travel, so do a thousand other laws and charter provisions regulating traffic and vehicles, movement of goods, licensing and regulation of businesses, professions and occupations, imposing taxes and fees, and prescribing the filing of returns and reports. In short, virtually every law which requires one to file an application, take an examination, submit to an inspection, pay a fee, make a report or return, or do any of the thousand and one things which in one degree or another imposes conditions and sets up standards and qualifications is threatened now with judicial invalidation as an encroachment on the right of travel.

Travel is not mentioned in the constitution; right to jury trial, for example, is. Because the law may compel one to sit as a juror, is it to be rendered unconstitutional as infringing on his freedom of travel? What about the right to

confront witnesses? Will that specifically enumerated right vaporize in the courts on the unenumerated right of the witness to journey? And what becomes of compulsory school attendance, both for children under 16 and for doctoral candidates at the state's universities? What of absconding debtors and absconding fathers? Do not the laws which render them amenable to their duties and responsibilities deprive them of their right to travel fast and far?

As the majority points out, the provision in the Articles of Confederation, art. 4 (1777), that "the people of each State shall have free ingress and regress to and from any other State," was not included in the Constitution of the United States nor made a part of either the Bill of Rights or any subsequent amendments. But there is one undeniable inference to be drawn from this overt omission and that is that the people have never intended to put travel rights above other individual rights and obligations; one reason could have been that the draftsmen of the constitution did not intend to invite the absurd consequences in judicial interpretation which might come from squaring all law, constitutional, statutory and decisional, against the right to travel. To include travel in the Bill of Rights might well have given it overriding import and rendered the whole constitutions and laws made pursuant to them subordinate and subservient to them.

Essentially, the right to travel is one of those natural rights afforded citizens of a free society but, like all such rights, one that by necessity must yield to the reasonable exercise of the powers of government. Freedom of movement should not be allowed to impair either the enumerated individual rights of others nor the express or implied powers of government, whether local, state or federal. There are few absolutes in law, and travel is not one of them. The law, for example, may make it punishable to enter, travel through or remain in a public park after hours; travel can be prohibited because of flood, fire, earthquake and pestilence. The power of Congress to declare war, raise armies and levy taxes, or the power of the Presi-

dent as Commander in Chief, as further examples, cannot be abrogated by the courts as an abridgement of the unwritten freedom of travel.

Court decisions affecting freedom of travel have little to do with such things as municipal civil service. *See Crandall v. Nevada,* 73 U.S. (6 Wall.) 35, 18 L. Ed. 744 (1867); *Edwards v. California,* 314 U.S. 160, 86 L. Ed. 119, 62 S. Ct. 164 (1941); *Kent v. Dulles,* 357 U.S. 116, 2 L. Ed. 2d 1204, 78 S. Ct. 1113 (1958); *Aptheker v. Secretary of State,* 378 U.S. 500, 12 L. Ed. 2d 992, 84 S. Ct. 1659 (1964); *United States v. Guest,* 383 U.S. 745, 16 L. Ed. 2d 239, 86 S. Ct. 1170 (1966); *Shapiro v. Thompson,* 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969); *Dunn v. Blumstein,* 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995 (1972).

Thus, *Corfield v. Coryell,* 6 F. Cas. 546 (No. 3230) (C.C.E.D. Pa. 1823), cited by the court in the present case, has little application to the Seattle charter's 1-year civil service residence requirement for the charter does nothing to prevent the "citizen of one state" from passing through, or residing, in Seattle for purposes of "trade, agriculture, professional pursuits, or otherwise." *Edwards v. California, supra,* did no more than hold unconstitutional a statute making it a misdemeanor to knowingly bring or assist in bringing an indigent person into the state of California. *Kent v. Dulles, supra,* did not involve the constitutional power of the United States to restrict travel, but questioned whether the Congress had actually empowered the Secretary of State to do so. The court made sure, in that opinion, that it was not passing upon the constitutional power of Congress in saying, at page 129:

> Thus we do not reach the question of constitutionality. We only conclude that § 1185 and § 211a do not delegate to the Secretary the kind of authority exercised here.

Both *Kent* and *Edwards* dealt solely with the direct right of travel and a direct impairment of it. No such embargo can be found in the Seattle charter respecting residence requirements for the civil service.

One cannot sensibly quarrel with the idea that

> The constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union.

(*United States v. Guest, supra* at 757), and that to shoot and kill Negroes traveling upon the public highways constitutes a denial of rights guaranteed by the equal protection clause and should be indictable as a crime—but on its face that case has no relevance here.

Another example, *Aptheker v. Secretary of State, supra,* cited by the majority, dicta aside, actually does no more than hold that a statute directing the Secretary of State to deny passports to persons who were members of groups or associations determined to be communists was unconstitutional and void. Indeed, so discriminatory and unfair was the statute and so broadly interdictory its language that it cast a blanket denial of the right to travel over groups of individuals solely because of their membership in a political organization and not because of their individual proclivities. *Aptheker* held that whatever strictures Congress might put on foreign travel by American citizens, those strictures must be applied fairly and equally. Indicting an individual, it found, because of mere membership in a group, without more, is unconstitutionally discriminatory. Not the slightest doubt was raised in that case that Congress has the constitutional power to bar travel out of the country or prescribe the amount of money a traveler can take, or embargo goods and articles, and in times of national emergency impose whatever conditions on travel as are necessary to cope with the crises.

Although *Shapiro v. Thompson, supra,* cited by this court, held unconstitutional Connecticut's 1-year waiting period as a condition of eligibility for public welfare, it does not come close to suggesting that the state's rules on eligibility for public assistance must equate under the constitution with eligibility for the civil service under the equal protection clause. The real foundation for that deci-

sion is that, with a large portion of public assistance coming from the federal treasury, the traveling indigent, having qualified for a statutory right to food, clothing, shelter and medical care granted in part by federal statutes in one state, cannot be deprived of that right on removal to another state. The real ground upon which the *Shapiro* case rests, therefore, is neither travel nor equal protection, but partly the large quantum of federal financing, vis-a-vis state contributions, and partly the nature of public assistance which deals in the necessities of life, food, clothing, medicine and shelter—those things which ought not be forfeit because of transfer from one state to another. Applying the *Shapiro* holding to the Seattle charter, reductio ad absurdum, the court would have to rule that, since one can qualify for public assistance in Seattle by residing in Connecticut, he can likewise qualify for the Seattle civil service by living in Hartford.

A more pertinent decision to the case at hand is *Kirk v. Board of Regents,* 273 Cal. App. 2d 430, 78 Cal. Rptr. 260 (1969), *appeal dismissed per curiam,* 396 U.S. 554, 24 L. Ed. 2d 747, 90 S. Ct. 754 (1970), sustaining the requirement that free tuition in the state universities and colleges may be limited to those students who have established a bona fide residence in the state for 1 year. In that case, the travel argument was made and expressly rejected, as it was again with respect to out-of-state tuition charged by the University of Minnesota in *Starns v. Malkerson,* 326 F. Supp. 234 (D. Minn. 1970), *aff'd mem.,* 401 U.S. 985, 28 L. Ed. 2d 527, 91 S. Ct. 1231 (1971).

That there is no actual connection between the residence requirement for the Seattle civil service and freedom of travel except perhaps in a purely coincidental sense is seen in *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.,* 405 U.S. 707, 31 L. Ed. 2d 620, 92 S. Ct. 1349 (1972), a case involving a direct per capita tax on travelers using publicly owned New Hampshire airports. Discussing and rejecting *Crandall v. Nevada, supra,* as inapplicable, the court said, at page 714:

The principle that burdens on the right to travel are constitutional only if shown to be necessary to promote a compelling state interest has no application in this context. See *Shapiro v. Thompson,* 394 U. S. 618 [22 L. Ed. 2d 600, 89 S. Ct. 1322] (1969).

The court upheld the tax or service charge. If, as was said in that case, "A permissible charge to help defray the cost of the facility is therefore not a burden in the constitutional sense," neither should so remote an idea as a civil service residence qualification be regarded as a burden on travel in a constitutional sense.

On a different point, this court says that it cannot find in the 1-year residence requirement what has come to be designated as a "compelling state interest." Unfortunately, that expression, originally intended to identify a legitimate public interest, has by the process of judicial accretion acquired a label that goes farther than the principle it described. Once labeled, the name becomes the principle. The quantum of reasonable public interest hitherto thought essential to sustain an exercise of the police power has now become a *compelling* state interest—whatever that term may mean. If, as in most legislation, there exists here an obvious public interest to be effectuated by the police power, and the legislation is otherwise within the constitution, the court should be without power to nullify it. Thus, in determining whether the police power is exercised within constitutional bounds, it is not incumbent upon the court to find that facts actually exist justifying the legislation, but only that they can be conceived to exist, and if that can be reasonably done the court must presume that the law was enacted for that purpose. *Shea v. Olson,* 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998 (1936); *Lenci v. Seattle,* 63 Wn.2d 664, 388 P.2d 926 (1964); *Markham Advertising Co. v. State,* 73 Wn.2d 405, 439 P.2d 248 (1968).

This court has said, too, concerning the police power, that the Fourteenth Amendment and Const. art. 1, § 12, prohibiting special privileges and immunities and guaranteeing equal protection of the laws, are no barriers to classifica-

tion. A statute to be constitutional need not apply equally to all persons. *Rinaldi v. Yeager,* 384 U.S. 305, 16 L. Ed. 2d 577, 86 S. Ct. 1497 (1966). The legislature or other legislative body may classify people for different purposes, recognizing that some may be regarded in law as members of one class, and others of another, but that such class legislation must apply alike to all persons within a class, and reasonable grounds must exist for making distinctions between those within and those without a designated class. *Baxstrom v. Herold,* 383 U.S. 107, 15 L. Ed. 2d 620, 86 S. Ct. 760 (1966). Within the boundaries of these two limiting principles, the legislative authority has broad power to define the class and legislate with respect to it. *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960), *cert. denied,* 364 U.S. 932, 5 L. Ed. 2d 365, 81 S. Ct. 379 (1961); *State ex rel. O'Brien v. Towne,* 64 Wn.2d 581, 392 P.2d 818 (1964). The constitution does not require things which are different in fact to be treated in law as though they are the same. *Tigner v. Texas,* 310 U.S. 141, 84 L. Ed. 1124, 60 S. Ct. 879, 130 A.L.R. 1321 (1940); *Rinaldi v. Yeager, supra.*

The term "compelling state interest" thus provides no real basis for deciding the case. In essence, it is a meaningless metaphor of judicial composition evoked from time to time to achieve a result which the constitutions do not otherwise allow, to permit the courts to say, as the court does here, that the City of Seattle does not have an interest of sufficiently compelling nature in establishing a civil service system and which may, coincidentally, only interfere with what is described as "freedom of travel."

The compelling state interest device, when employed to describe a principle of constitutional law, puts an inviting label on newly invented sets of judicial propositions which enable the judiciary to rewrite the constitutions at will and fashion new propositions never dreamed of by the framers nor established by succeeding generations. It is a doctrine which leaves the judiciary in active control of the legislative authority, giving it an ultimate power to determine

whether the public interest is strong enough to be compelling.

And who is to say how compelling the state interest must be in order to warrant a law supporting it? The judiciary, of course. And what must be the quantum of degree or interest and the extent of its compulsory nature? The courts will decide that, too. But the doctrine raises more questions than it answers. It answers the question of who is to discern whether the state has a genuine interest in achieving the ostensible purposes of the legislative enactment by declaring that it is the judiciary and not the legislature nor the people. Where is the *compelling state interest,* for example, in a public park, zoo, aquarium, library, swimming pool, museum, marina, auditorium, stadium? Just how compelling are these public interests and must the public interest be a compulsory one to be compelling? In other words, must the legislative purpose be a matter of necessity for the protection of the public peace, health, safety, welfare and morals? Is it now a principle of constitutional law that, unless the societal interests are of so compelling a nature as to be indispensable to its survival, any law interfering to any degree with the untrammelled freedom of the individual will fail to meet the compelling state interest test? Long before the compelling state interest doctrine had been invented, we had departed that era of constitutional law where the state had little compelling interests in anything except the maintenance of roads, highways, canals and the public safety and national defense. We should not return to it.

I would avoid the curious anomaly now which finds a sufficiently compelling state interest to support a "durational residence requirement," but not for a 1-year period. The court says that the city is within its powers in requiring that one be a resident of Seattle for an indeterminate period of whatever length this court may subsequently decide, but that if the people fix it at a year instead of for a lesser period—such as 11 months? or 6 months? or 30

days?—this does not violate the basic rights of American citizens to travel freely throughout the Union.

The court's assumption, therefore, that the city has not shown the existence of what has come to be called a compelling state interest appears to me both unsound and unwarranted; it implies that a litigant is bound to labor the obvious or be held to have waived it. What has come to be labeled a compelling state interest is no more than the old idea that the public—the state, or city—has a legitimate interest in achieving the intended legislation, in this case that the city has a legitimate interest in creating and maintaining a sound civil service. If it has, then in the exercise of its police power it may rightfully adopt all reasonable means to accomplish this legitimate purpose, the means that are not expressly forbidden by statute or constitution. The police power is not, when constitutionally exercised, a bad power, but a good one:

> In fine, when reduced to its ultimate and final analysis, the police power is the power to govern. It is not meant here to be asserted that this power is above the constitution, or that everything done in the name of the police power is lawfully done. It is meant only to be asserted that a law which interferes with personal and property rights is valid only when it tends reasonably to correct some existing evil or promote some interest of the state . . .

*State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 178, 117 P. 1101 (1911).

*Davis-Smith* not only abridged the inferential freedom of travel, but expressly sustained the constitutionality of the industrial insurance system which deprived the workman of his common-law right to sue his employer. The interests of the state, or a city, or society in general, in having its civil service operated by bona fide residents, need no argument, so self-evident are they. If all statutes, charters, ordinances and resolutions had to face the compelling state interest test now advanced by the court, or if the state and its subdivisions could be held to have waived the point

simply by not arguing the obvious, virtually no statute or ordinance would survive.

Courts do not exist in a vacuum; they are bound to assume the existence of the compelling or public interest to establish and enforce a statute until the lack of it is shown. If the people of Seattle think it best that their parks, swimming pools, libraries, power plants, police and fire departments and other city agencies operating in the public interest are better operated by those who first show a bona fide residence in the city and that it is well to keep them out of the hands of drifters, vagabonds, nomads and travelers for a minimal residence of 1 year, then the court is obliged, I think, to find, as a matter of law, a sufficient public interest to pronounce it a compelling one.

There are exceptions from time to time, but most laws in a democracy arise from the felt necessities of the times or a collective ambition to improve the quality of life. A great majority of the amenities of life and many of the necessities furnished by the collective action of people through their municipal governments originated with and come into full existence through local government. The public common schools, public secondary schools and the great tax-supported universities all are creatures of local government. So, too, are tax-supported hospitals and clinics. Public parks and gardens, zoos, playgrounds and stadia, libraries and museums are almost entirely the products of local genius and energy. Water systems, swimming pools, sewer systems, animal shelters and in recent years electrical energy—with few exceptions—have been built and are maintained by local governments. The establishment of none of these can be attributed to travelers, itinerants and wanderers, who, it is quite unlikely, short of a reasonable stay in Seattle, would generate a single plausible idea about initiating such things, much less dedicate their energies to creating them.

It is the aim of the residency requirement of the charter to provide a sound and efficient civil service, to encourage people to take up residence in Seattle and become a part of

81 Wn.2d    p. 203, line 13      The cite "RCW 82.03.130(4)"
                                  should be "RCW 82.03.130(3)"

         p. 863               �help The plaintiff's surname should
                                  be spelled "Andersen"

the community, to inspire the uprooted to take roothold, to elevate the standards of public service. One year is a comparatively short time in which to identify one's self and one's family with a community and stake their future there. Is it too much under our constitutions to expect that while all persons coming within the city may use and enjoy these great public facilities on equal terms with those who built and maintain them they too must live in Seattle a year before they are eligible for employment in buildings, operating and maintaining them? I see nothing unconstitutional whatever about the Seattle charter's requirement of a year's residence for eligibility to the civil service and, accordingly, would reverse.

HUNTER, J., concurs with HALE, C.J.

Petition for rehearing denied March 16, 1973.