[No. 43821-2-I. Division One. October 30, 2000.]

*In the Matter of the Interest of* M.G.

*Christopher Gibson* (of *Nielsen, Broman & Associates, P.L.L.C.*), for appellant.

*Helen A. Anderson*, for respondent.

ELLINGTON, J. — Parents have the right to restrict the movements of their children. The question here is how far

the state can go in supporting and enforcing such parental restrictions. In the case of at-risk youths, we hold the court can order the child to stay away from certain places or neighborhoods if the restriction is reasonably related to a risk to the child. Here, M.G. was adjudicated an at-risk youth, and the court ordered her to stay away from certain neighborhoods. We hold that with one exception, the restrictions were constitutionally proper, because the restrictions served a legitimate state purpose and the record demonstrates a relationship between a risk to M.G. and the limits imposed.

## FACTS

M.G. first ran away from home when she was 11, and ran away at least four times thereafter. She usually returned home within 24 hours. On September 17, 1998, however, when she was 15, M.G. got into a van on Broadway with a large group of "transient youth" and drove to Olympia. She then continued traveling south with two men in their early 20s. Ten days later, M.G. called her parents from Eugene, Oregon. Eugene police located M.G., and her parents flew her home that night.

The following week, M.G.'s parents filed an at-risk youth (ARY) petition[1] alleging that M.G. had repeatedly run away, was occasionally suicidal, failed to attend school, shoplifted, and did not obey house rules. Attached to the petition was a report from the Department of Children and

---

[1] Parents are authorized to file ARY petitions by RCW 13.32A.191. An "at-risk youth" is a juvenile:

(a) Who is absent from home for at least seventy-two consecutive hours without consent of his or her parent;

(b) Who is beyond the control of his or her parent such that the child's behavior endangers the health, safety, or welfare of the child or any other person; or

(c) Who has a substance abuse problem for which there are no pending criminal charges related to the substance abuse.

RCW 13.32A.030(2). For an overview of this legislation, see *In re Interest of M.B.*, 101 Wn. App. 425, 433-37, 3 P.3d 780 (2000).

Family Services which stated that at the age of 11, M.G. had been diagnosed with a bipolar disorder for which she required medication, and that she had attempted suicide at least once.

Among the various types of relief sought by M.G.'s parents was a requirement that M.G. stay away from the Seattle areas of Broadway, the Pike Place Market, and the University District. At the ARY hearing, M.G.'s mother testified to specific concerns about the areas she wanted M.G. to stay away from. She alleged that M.G. had shoplifted from more than seven stores in the Pike Place Market area, and had admitted to abusing alcohol on Broadway. In addition, she testified that she was concerned that M.G. was sexually active, and she did not want M.G. "in places where these things are occurring." In the course of this explanation, M.G.'s mother made a passing reference to the University of Washington.[2]

M.G. testified that she had shoplifted from only a single store, which she said was closer to Westlake Center than to the Pike Place Market. She acknowledged some of her parents' concerns about the Broadway District, but argued that running away was just "one mistake" in the many times she had been there. She said she rarely went to the University District. M.G. also expressed concern that geographic restrictions would prevent her from distributing a magazine she publishes.[3]

The court found M.G. to be an at-risk youth under RCW 13.32A.030(2)(a), because she had been absent from home for more than 72 hours without parental consent. Noting that M.G.'s 10-day absence traveling with adult males was

---

[2] M.G.'s mother explained:

> At the University of Washington [M.G.] had her seven year old sister in tow, . . . hoping that [S.G.] would be a mitigating influence on her. And it has come out now that she has had over six sexual partners, starting this summer. So she's sexually active. It's another issue that we're going to have to deal with.

[3] The record includes several references to M.G.'s magazine and to her political activities, but provides no description of those activities or of the content of her magazine.

"very dangerous to a 15 year old's health and safety," the court ordered M.G. to abide by the "house rules" until the next disposition hearing.

At the disposition hearing a few weeks later, M.G.'s mother again explained why she and M.G.'s father believed the geographic restrictions were important:

> We're not here to try and seek—to make [M.G.'s] life untenable or to infringe on her right to expression or anything like that. It's really quite the contrary. We want her to continue to write her magazine. I did help her last week distribute it and copy it. You know, I'm happy to do that.
>
> If she wants to go to rallys [sic] or anything like that, we would be happy perhaps with an additional comment that she not enter those areas unless she's under adult supervision. And we say that because [M.G.'s] impulsivity has resulted in her putting herself seriously at risk. She does come in contact with some people in those areas that I think have influenced her to do some things that aren't in her best interest.
>
> And we just would like to have a little bit more supervision of her right now . . . .

The dispositional order prohibited M.G. from entering the Pike Place Market area, the University District, and the Broadway area without parental permission. M.G. appeals, arguing that the orders impermissibly restrict her constitutional rights of movement and free expression.

## DISCUSSION

### A. Mootness

■ ■ Supervision of M.G. was terminated because the court found she was no longer at risk. The issue presented here is therefore technically moot. We may decide a moot case when it involves a matter of continuing and substantial public interest.[4] In determining whether such an interest is involved, we consider the public or private nature of the question presented, the need for an authoritative deter-

---

[4] *In re Interest of M.B.*, 101 Wn. App. at 432 (citing *In re Detention of Swanson*, 115 Wn.2d 21, 24-25, 793 P.2d 962, 804 P.2d 1 (1990)).

mination that will provide guidance to public officers, and the likelihood the question will recur.[5]

This case meets these criteria. No previous case has addressed the question presented here, and the substantial public nature of the issue and the potential frequency of its recurrence are evident. We therefore reach the merits.

## B. Constitutionality of Geographic Restriction

The freedom of travel has long been recognized as a fundamental right, although its precise source has not been "ascribe[d] . . . to a particular constitutional provision."[6] "[T]he right is so important that it is 'assertable against private interference as well as governmental action . . . a virtually unconditional personal right, guaranteed by the Constitution to us all.' "[7] This right applies to travel within a state as well as travel across state lines.[8] The right has been held to be fundamental for minors as well as adults in some circumstances.[9]

The issue as framed by M.G. is not whether the court can impose geographic restrictions upon at-risk youth,[10] but

---

[5] *M.B.*, 101 Wn. App. at 432-33.

[6] *Shapiro v. Thompson*, 394 U.S. 618, 630, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969); *see also Jones v. Helms*, 452 U.S. 412, 418, 101 S. Ct. 2434, 69 L. Ed. 2d 118 (1981); *Eggert v. City of Seattle*, 81 Wn.2d 840, 844, 505 P.2d 801 (1973).

[7] *Saenz v. Roe*, 526 U.S. 489, 498, 119 S. Ct. 1518, 143 L. Ed. 2d 689 (1999) (quoting *Shapiro*, 394 U.S. at 643 (Stewart, J., concurring)). In *Aptheker v. Secretary of State*, Justice Douglas stated:

> [F]reedom of movement is the very essence of our free society, setting us apart. Like the right of assembly and the right of association, it often makes all other rights meaningful—knowing, studying, arguing, exploring, conversing, observing and even thinking. Once the right to travel is curtailed, all other rights suffer, just as when curfew or home detention is placed on a person.

378 U.S. 500, 520, 84 S. Ct. 1659, 12 L. Ed. 2d 992 (1964) (Douglas, J., concurring).

[8] *State v. McBride*, 74 Wn. App. 460, 465 n.1, 873 P.2d 589 (1994) (citing *Eggert*, 81 Wn.2d at 845).

[9] *State v. J.D.*, 86 Wn. App. 501, 508, 937 P.2d 630 (1997) (right of minors to move freely held fundamental in context of general curfew ordinance; ordinance failed to satisfy strict scrutiny test).

[10] M.G. does not contend the court acted outside its statutory authority. RCW 13.32A.196(2) authorizes the court to set conditions of supervision. Geographic

whether they are constitutionally justified here. M.G. points out that violations of ARY orders may subject a youth to detention sanctions for contempt.[11] She maintains that because her right to move freely is fundamental, the juvenile court's order is subject to the strictest of scrutiny.

■ M.G. is correct that, in general, the right of juveniles to move freely has been held a fundamental right. State action infringing upon a fundamental right is reviewed under the strict scrutiny test, which requires that the infringement be narrowly tailored to promote a compelling state interest.[12]

■ These principles, however, do not end our inquiry. Although minors generally are entitled to the same constitutional rights and protections as adults,[13] circumstances may justify a state's curtailment of those rights in ways not permissible for adults.[14] A state may take into account the unique characteristics and needs of unemancipated minors, and may limit the freedom of children to make important decisions having potentially serious consequences.[15] A state also can properly conclude that parents, who have the primary responsibility for their children's well-being, " 'are entitled to the support of laws designed to aid discharge of

---

restrictions are not specifically mentioned, but presumably fall under the court's authority to order "[a]ny other condition the court deems . . . appropriate . . . ." RCW 13.32A.196(2)(e).

[11] *See* RCW 7.21.030(2)(e); RCW 13.32A.250(2)-(3).

[12] *See J.D.*, 86 Wn. App. at 508; *City of Seattle v. Pullman*, 82 Wn.2d 794, 803, 514 P.2d 1059 (1973) (minor curfew ordinances subject to strict scrutiny).

[13] *See Planned Parenthood v. Danforth*, 428 U.S. 52, 74, 96 S. Ct. 2831, 49 L. Ed. 2d 788 (1976).

[14] *Prince v. Massachusetts*, 321 U.S. 158, 168, 64 S. Ct. 438, 88 L. Ed. 645 (1944); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995) ("Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, *i.e.*, the right to come and go at will.").

[15] *Bellotti v. Baird*, 443 U.S. 622, 635, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979).

that responsibility.' "[16] As the lead opinion in *Bellotti v. Baird* explained, children are entitled to the protections of the Constitution, but " '[c]hildren have a very special place in life which law should reflect. Legal theories and their phrasing in other cases readily lead to fallacious reasoning if uncritically transferred to determination of a State's duty towards children.' "[17]

In *Bellotti*, the U.S. Supreme Court set forth three reasons that may justify treating the constitutional rights of children differently from those of adults: (1) the peculiar vulnerability of children; (2) their inability to make critical decisions in an informed, mature manner; and (3) the importance of the parental role in child rearing.[18] In *State v. J.D.*, we applied the *Bellotti* factors and found them not satisfied. We held the right to move freely thus remained fundamental in the context of a juvenile curfew ordinance, and that the ordinance could stand only if it satisfied the strict scrutiny test. It did not.[19]

Here, M.G.'s legal status and her personal circumstances each independently satisfy the *Bellotti* factors and require the conclusion that her right to move freely is not fundamental.

---

[16] *Bellotti v. Baird*, 443 U.S. 622, 639, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979) (quoting *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S. Ct. 1274, 20 L. Ed. 2d 195 (1968)). The *Bellotti* Court explained:

The unique role in our society of the family, the institution by which "we inculcate and pass down many of our most cherished values, moral and cultural," requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children.

*Bellotti*, 443 U.S. at 634 (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503-04, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977)).

[17] *Bellotti*, 443 U.S. at 633-34 (quoting *May v. Anderson*, 345 U.S. 528, 536, 73 S. Ct. 840, 844, 97 L. Ed. 1221 (1953) (Frankfurter, J., concurring)).

[18] *Bellotti*, 443 U.S. at 634.

[19] *State v. J.D.*, 86 Wn. App. 501, 507-08, 937 P.2d 630 (1997). Considerable controversy exists as to the application of the *Bellotti* factors in the context of juvenile curfew cases. One commentator contends that a "pervasive lack of doctrinal uniformity" has resulted from both the Supreme Court's view of the rights of minors and the variety of theories alleged by challengers. *See* Patryk J. Chudy, *Doctrinal Reconstruction: Reconciling Conflicting Standards in Adjudicating Juvenile Curfew Challenges*, 85 CORNELL L. REV. 518, 522 (2000).

The Legislature amended the at-risk youth provisions of the Family Reconciliation Act in 1995, to address the needs of children who endanger themselves and parents who struggle to support and guide them.[20] M.G.'s adjudication as an at-risk youth is sufficient in itself to establish that her right to move freely is not fundamental. One need look no further than the legislative findings and intent section of the statute to understand why this is so:

> The legislature recognizes there is a need for services and assistance for parents and children who are in conflict. These conflicts are manifested by children who exhibit various behaviors including: Running away, substance abuse, serious acting out problems, mental health needs, and other behaviors that endanger themselves or others.
>
> . . . .
>
> The legislature intends to increase the safety of children through the preservation of families and the provision of assessment, treatment, and placement services . . . .
>
> . . . .
>
> The legislature intends to provide for the protection of children who, through their behavior, are endangering themselves. . . . The legislature further intends to empower parents by providing them with the assistance they require to raise their children.[21]

An ARY adjudication thus represents a judicial determination that a youth is endangering herself, and that her parents must be supported in their efforts to assist and guide her. Such a determination by itself satisfies the *Bellotti* factors.

Applying the three *Bellotti* factors directly to M.G.'s circumstances leads to the same conclusion. First, M.G.'s vulnerability is obvious. She has attempted suicide. She has experienced a three-week psychiatric hospitalization, requires medication for her bipolar disorder, and undergoes

---

[20] Becca Bill, LAWS OF 1995, ch. 312.

[21] RCW 13.32A.010. For an overview of this legislation, see *M.B.*, 101 Wn. App. at 433-36.

weekly counseling. At the age of 15, she ran away to the streets with transient youths and adult men, and was missing for 10 days.

Second, M.G.'s ability to make critical decisions is impaired. She is impulsive, lacks the experience, perspective, and judgment to recognize and avoid choices with potentially serious consequences,[22] and so endangers her own safety and welfare. In contrast to the blanket curfew restricting the movement of all minors that we struck down in *State v. J.D.*, a restriction upon M.G.'s choice of where to go, when, and with whom is exactly the sort of "profound decision" which may be left to the state.[23]

Finally, her parents requested the court's support in their efforts to regain control of M.G. so that they could better carry out their parental role. Support for parents of at-risk youth is one of the purposes of the Family Reconciliation Act.[24] Legal restrictions on minors are constitutionally appropriate where the restriction is supportive of the parental role and aids the child's chances for full growth, maturity, and meaningful participation in a free society.[25]

Each of the *Bellotti* factors is thus satisfied. M.G.'s circumstances illustrate the health, welfare, and safety concerns that warrant the state's interest in protecting her.[26] These are exactly the considerations that justify the curtailment of rights of minors. M.G.'s right to move freely, therefore, while important, is not fundamental, and the order imposing the geographic restrictions is subject to less than strict scrutiny.

■ Although strict scrutiny does not apply, we note that the state's interests here satisfy the first prong of the strict

[22] *Bellotti*, 443 U.S. at 635.

[23] *See J.D.*, 86 Wn. App. at 507 (quoting *Waters v. Barry*, 711 F. Supp. 1125, 1137 (D.D.C. 1989)).

[24] *See* RCW 13.32A.010.

[25] *Bellotti*, 443 U.S. at 638-39.

[26] We expect that in the case of any child adjudicated an ARY, the analysis would be the same.

scrutiny test—that is, that the intrusion upon constitutional rights be justified by a compelling state interest. Ensuring the welfare of at-risk youth and preserving families certainly are compelling state interests.[27] M.G. in fact concedes this point.

M.G.'s principal argument is that the restrictions imposed upon her do not satisfy the second part of the strict scrutiny test: the requirement that the restrictions be narrowly tailored to achieve the state's compelling interest. In this regard, M.G. asks us to review the compelling need for each restriction in light of the specific concern that prompted her adjudication as an at-risk youth. Because she was adjudicated an ARY on account of her absence from home for over 72 hours, M.G. describes the state's interest as limited to that single episode of running away.

■ Because strict scrutiny is not required, the "narrowly tailored" part of the strict scrutiny test does not apply. But we emphasize that we disagree with M.G.'s premise that the state's interest is confined to the statutory factor that led to her classification as an ARY. The state's interests in an at-risk youth are not limited to concerns identifiable from the events that ultimately precipitate the petition. While certain factual findings must be made before a court can exercise its authority under the statute, other facts about the child and her family are not irrelevant. The state's interests are those expressed in the broader legislative purpose—protection of a child who is endangering herself, and preserving families by assisting parents in their efforts to ensure the child's safety and well-being. Our review of the court's order, therefore, is not confined to whether a particular restriction will help prevent M.G. from running away again.

The remaining question is by what standard we review the restriction upon M.G.'s right of free movement. M.G. does not suggest what test should apply in place of strict scrutiny. Indeed, although she invokes the First, Fifth and

---

[27] *See* RCW 13.32A.010; *J.D.*, 86 Wn. App. at 508.

Fourteenth Amendments of the U.S. Constitution, M.G. articulates no clear basis for her constitutional challenge. She offers no equal protection analysis beyond her assertion that strict scrutiny applies.

Two types of scrutiny may apply in equal protection cases where strict scrutiny is not mandated. Intermediate scrutiny requires that the classification serve an important governmental objective by means substantially related to its achievement.[28] Our Supreme Court in recent cases has held this level of scrutiny applies only where both an important right and a semisuspect class are involved.[29] M.G.'s legislative classification is that of children who have been adjudicated at-risk youth—neither a suspect nor a semisuspect class.[30] Intermediate scrutiny is therefore not mandated under recent Washington cases. Instead, we apply the rational basis test. And because, as M.G. concedes, the state's compelling interests may be served by stay-away orders in ARY cases, we turn our attention directly to the particular restrictions imposed here.

Under the rational basis test, a restriction imposed by the state upon members of a particular class must have a rational relationship to a legitimate state

---

[28] See Miss. Univ. for Women v. Hogan, 458 U.S. 718, 724, 102 S. Ct. 3331, 73 L. Ed. 2d 1090 (1982); State v. Schaaf, 109 Wn.2d 1, 17-18, 743 P.2d 240 (1987) (classification must further substantial interest of the state).

[29] See DeYoung v. Providence Med. Ctr., 136 Wn.2d 136, 141, 960 P.2d 919 (1998); Griffin v. Eller, 130 Wn.2d 58, 65, 922 P.2d 788 (1996). These cases represent a departure from previous case law requiring only an important right or a suspect class to invoke intermediate scrutiny. See State v. Shawn P., 122 Wn.2d 553, 560, 859 P.2d 1220 (1993). United States Supreme Court cases hold intermediate scrutiny applies when either an important right or a semisuspect class is involved. See, e.g., Hogan, 458 U.S. at 724. While this divergence from federal equal protection analysis may pose problems in other cases, here the result is the same under either test. A compelling state interest is by definition both legitimate and important. Because the state's interests here are of the highest level, a geographic restriction satisfies both the rational basis and the intermediate scrutiny tests if it furthers the state's interests and is related to a risk to the child.

[30] Schaaf, 109 Wn.2d at 17-18 (juveniles not suspect nor semisuspect class).

interest.[31] In the context of stay-away orders in ARY dispositions, this means that use of such a restriction must serve the state's purpose, and that the particular restriction must be rationally related to a risk to the child.

As we turn to examine the three specific geographic restrictions imposed by the court, we are mindful that the infringement here is minimal. M.G.'s parents insist that she be supervised when she is in the areas where they feel she is most at risk of harm. Presumably M.G., being 15, finds the presence of an adult unwelcome. But supervision is hardly a significant infringement upon the rights of movement of a 15-year-old who has shown herself to be at risk of harm.

Two of the restrictions upon M.G.'s freedom of movement satisfy the rational basis test. Both serve the state's interests in protecting M.G. and empowering her parents, and there is a demonstrated relationship between the restrictions and a risk to M.G. The Broadway District was the area in which M.G. abused alcohol and was the point from which she disappeared for 10 days. M.G.'s mother testified to M.G.'s repeated shoplifting in the Pike Place Market area. These activities all pose a risk to M.G. The record thus establishes a relationship between a risk and the restrictions.

As for the University District, however, there is insufficient information in the record to establish the purposes to be served by the restriction. M.G.'s mother testified that M.G. was sexually active and that she did not want M.G. "in places where these things are occurring." M.G.'s mother also testified that M.G. recently revealed she had been raped, and M.G.'s father made reference to M.G.'s sexual involvement with adults. The concern of M.G.'s parents about her sexual activity was clearly both genuine and reasonable. Missing, however, is any testimony connecting that risk to the University District. M.G.'s mother's only reference to the University District was her testimony that M.G. went there with her seven-year-old sister, whose

---

[31] *See Seeley v. State*, 132 Wn.2d 776, 795, 940 P.2d 604 (1997).

presence was apparently a positive influence. M.G. testified she "almost never" goes there. In short, the record contains no evidence suggesting that visiting the area posed a risk to M.G., sexually or otherwise.

Respect for parental prerogatives runs deep. Judicial enforcement of such prerogatives, however, requires a relationship between the proposed restriction and the safety of the child. If a parent's decision is reasonable, the court is free to support it by giving it the force of a court order. Where constitutional rights are affected, the reasonableness of the decision must be discernible from the record and may not rest upon speculation or assumptions. In many—perhaps most—cases, it may be easy to express why an at-risk youth should have adult supervision in certain places or at certain times. But the fact that such an articulation may not be difficult does not make it less important. Here, the record does not show a relationship between a risk to M.G. and the restriction on her freedom of movement in the University District, and the restriction was therefore an unreasonable infringement on M.G.'s right to move freely.[32]

## CONCLUSION

The order in M.G.'s case was constitutionally sound insofar as it restricted M.G. from unsupervised presence in the Broadway and Pike Place Market areas. The University District restriction, however, was not supported by the record, and was therefore an improper infringement.

Affirmed in part and reversed in part.

AGID, C.J., and APPELWICK, J., concur.

---

[32] M.G. also contends that the geographic restrictions violated her constitutional right to free expression because they prevented her from distributing her magazine and "otherwise expressing herself in these areas." We do not review this claim. First, there is no description of M.G.'s activities in the record. Second, the record does establish that M.G.'s parents supported her publishing work and her attendance at rallies, and helped distribute her magazine, so there appears to have been in fact no infringement. Finally, there is no separate analysis of free expression issues in M.G.'s brief.