LOUISE ABRAHAMS, APPELLANT, v. CIVIL SERVICE COM-
MISSION OF THE STATE OF NEW JERSEY AND CITY
OF NEWARK, RESPONDENTS.

Argued November 20, 1973—Decided May 8, 1974.

62

*Mr. Elliot M. Baumgart* argued the cause for appellant (*Messrs. Baumgart and Ben-Asher,* attorneys).

*Mr. Althear A. Lester,* Assistant Corporation Counsel, argued the cause for respondent City of Newark (*Mr. William H. Walls,* Corporation Counsel of the City of Newark, attorney).

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. The primary question on this appeal is whether the Newark ordinance requiring continued residence in the city as a condition of employment by the city of officers and employees, held valid by this court in *Kennedy v. City of Newark,* 29 N. J. 178 (1959), is now to be held violative of the federal constitution by virtue of anything held in, or logically compelled by, the decision of the United States Supreme Court in *Shapiro v. Thompson,* 394 U. S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969). Our determination is in the negative.

Appellant Mrs. Abrahams began working in the Newark Law Department as a secretary in 1966, when a resident of Union. She had given a Newark address when applying for the position. In 1967 she moved to Newark, and back to Union in 1970. In 1970 the corporation counsel notified all secretaries and clerical personnel in his department that anyone not a resident of the city by January 1, 1971 would be subject to dismissal. When applicant failed to return to the city, disciplinary proceedings were instituted against her, resulting in her termination as of May 21, 1971. She thereupon filed an appeal to the Civil Service Commission.

The Newark ordinance, originally adopted in 1932, exempts from its requirement of continued residence any persons, in the discretion of the Director of any department, "for good cause shown", where (a) the health of the person "necessitates" residence outside of the city; (b) the nature of the employment is such as to require residence outside the city; and (c) "Special circumstances attach permitting

residence outside of the city limits." The 1970 enforcement effort in the Newark Law Department did not extend to the lawyer-employees because of the provisions of the statutory predecessor of *N. J. S. A.* 40A:9–1.[1]

Before the Civil Service Commission appellant made the contentions: (a) that the ordinance was an unconstitutional restriction of her right to travel; (b) the "special circumstances" exception was void for vagueness and insufficient standards; (c) the ordinance had been discriminatorily enforced against her. The hearing officer of the Commission raised the added issue whether appellant had shown "special circumstances", her contentions being that she could not afford apartment rents in Newark, the crime rate was high, and she would have to take her son out of school in Union. On the question of selective enforcement, appellant adduced evidence that in addition to the nine attorneys in the Law Department, 21 persons, out of a statistical sample of 142 employees in various city departments studied, were non-residents.

The hearing officer of the Commission ruled he could not decide the constitutional issue. He held the ordinance had not been selectively enforced as it had been uniformly enforced in the Law Department, where appellant was employed, and he concluded that the reasons advanced by the

---

[1]This statute, effective July 1, 1971, and its predecessor, *N. J. S. A.* 40:46–14, require that "officers" of municipalities reside therein. The latter contained an exception for "counsel, attorney, engineer or health officer". *N. J. S. A.* 40A:9–1 excepts, in addition, an "auditor or comptroller". Under *L.* 1972, *c.* 3, Secs. 1 and 11, municipalities are forbidden to require policemen or firemen to reside in the municipality. *N. J. S. A.* 40A:14–9.1 and 40A:14–122.1. Policemen and firemen were considered "officers" within *N. J. S. A.* 40:46–14. *Mercadante v. City of Paterson*, 111 *N. J. Super.* 35, 38 (Ch. D. 1970), aff'd 58 *N. J.* 112 (1971).

Appellant has not raised any question as to the construction of any of these statutes or as to the validity of the exceptions or exemptions contained therein, either separately or taken in conjunction with the Newark ordinance.

appellant for not residing in the city were not sufficient. He advised a dismissal of the appeal. The Civil Service Commission adopted the report and recommendation.

An appeal to the Appellate Division was certified by us prior to the hearing by that tribunal. 63 *N. J.* 561 (1973).

The instant ordinance was attacked in broad terms by Newark employees in *Kennedy v. City of Newark, supra.* It was charged that the ordinance contravened Article I, par. 1 of the 1947 Constitution which reads:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

The court, in an opinion by Chief Justice Weintraub, sustained the ordinance, saying (29 *N. J.* at 183):

"Quite obviously the rights there proclaimed are not absolute. They are qualified by the police power vested in government for the common good.

The question is not whether a man is free to live where he will. Rather the question is whether he may live where he wishes and at the same time insist upon employment by government."

The court said the answer to the last question depended upon whether there was a rational basis for the residence requirement in furtherance of the public welfare. (at 183). It found such a rational basis in that:

\* \* \* Government may well conclude that residence will supply a stake or incentive for better performance in office or employment and as well advance the economy of the locality which yields the tax revenues. That our Legislature has long assumed the existence of authority so to legislate upon a broad basis appears from statutes referred to hereinafter. Such expressions as may be found uniformly reject claims of constitutional infirmity. *Kaplan, Civil Service* (1958), *p.* 49; 2 *Antieau, Municipal Corporation Law* (1955), § 13.06, *p.* 236; 3 *McQuillin, Municipal Corporations* (3d ed. 1949), § 12.59, *p.* 240. (at 184)

The objectors in *Kennedy* also assailed the ordinance as an unreasonable exercise of power, citing such reasons for moving out of the city as personal health and inability to find satisfactory living quarters, but the court found that unreasonableness was not clearly established (at 185).

*Kennedy* was recently reaffirmed by this court in *Mercadante v. City of Paterson, supra.*

## I.

Appellant contends that *Kennedy* is superseded by *Shapiro v. Thompson, supra,* which assertedly recognized as a "fundamental right" the right to travel — a right which cannot be impaired or restrained except on a showing of a "compelling state interest". It is contended that the residence restriction in the Newark ordinance infringes on the right of Newark employees to "travel" in the sense of changing their places of residence from Newark to beyond the city limits. We find the argument insubstantial. The Supreme Court was at pains in *Shapiro,* and has been even more so in later cases, including, very recently, *Memorial Hospital v. Maricopa County,* 415 *U. S.* 250, 94 S. Ct. 1076, 39 *L. Ed.* 2d 306 (1974), to make clear that the holding in *Shapiro* was not applicable to *bona fide* continuing residence requirements as distinguished from pre-qualifying durational residence requirements. See 394 *U. S.* at 636, 638, *n.* 21, 89 S. Ct. 1322.

In *Shapiro* the court held that a state could not constitutionally impose a requirement for receipt of welfare payments that the applicant be a resident of the state for a year. The prerequisite offended the Equal Protection Clause in that it created two classes of needy residents "indistinguishable from each other except that one is composed of residents who have resided a year or more, and the second of residents who have resided less than a year, in the jurisdiction. On the basis of this sole difference the first class [was] granted and the second class [was] denied welfare

aid upon which may depend the ability \* \* \* to obtain the very means to subsist — food, shelter, and other necessities of life". 394 *U. S.*, at 627, 89 S. Ct., at 1327.

The court might well have subsumed the deprivation under the fundamental right of an indigent resident to physical survival. But in the light of the court's conclusion that the very purpose of the regulation was to deter immigration into the state by indigents, 394 *U. S.*, at 628–630, 634, 89 S. Ct. 1322, it chose to characterize the right impaired in terms of the "chilling" effect of the law on would-be migrants who would be deterred by the prospect of destitution consequent upon not finding employment during the one-year waiting period — thereby impinging on the "fundamental" right of interstate travel.[2] A countervailing "compelling" state interest in the law was necessary, but absent. 394 *U. S.*, at 627, 89 S. Ct. 1322.

In any event, the fact that the right to travel represented only a limited aspect of *Shapiro* and that there was no intent therein to affect the validity of residence requirements not of a durational nature is made perfectly clear by the recent comment on *Shapiro* by the Supreme Court in *Memorial Hospital v. Maricopa County, supra* (415 *U. S.* at 254, 255, 94 S. Ct. at 1080, 39 *L. Ed.* 2d at 313):

The right of interstate travel has repeatedly been recognized as a basic constitutional freedom. Whatever its ultimate scope, however, the right to travel was involved *in only a limited sense* in *Shapiro*. The Court was there concerned only with the right to "[migrate], with intent to settle and abide" or, as the Court put it, "to migrate, resettle, find a new job and start a new life." 394 *U. S.*, at 629, 89 S. Ct., at 1328. Even a bona fide residence requirement would burden the right to travel, if travel meant merely movement. But, in *Shapiro*, the Court explained that "[t]he residence requirement and the one year waiting period requirement are distinct and independent prerequisites" for assistance and *only the latter was held to be uncon-*

---

[2] The constitutional sources of the right to travel are discussed in Note, "Residence Requirements after *Shapiro v. Thompson*", 70 *Colum. L. Rev.* 134, 137–39 (1970).

*stitutional.* 394 *U. S.,* at 636, 89 S. Ct., at 1332. Later, in invalidating a durational residency requirement for voter registration on the basis of *Shapiro,* we cautioned *that our decision was not intended to "cast doubt on the validity of appropriately defined and uniformly applied bona fide residence requirements." Dunn v. Blumstein,* 405 *U. S.* 330, 342 n. 13, 92 S. C. 995, 31 L. Ed. 2d 274 (1972). (Emphasis added.)

A foreshadowing of the rejection by the Supreme Court in *Memorial Hospital* of any idea that *Shapiro* threatened the validity of simple continuous residence requirements, state or municipal, founded on a rational basis, came in the litigation by the Detroit police over the continuous residence requirement for police by that city — *Detroit Police Officers' Ass'n v. City of Detroit,* 385 *Mich.* 519, 190 *N. W.* 2d 97 (S. Ct. 1971). The ordinance was sustained by the state court on the traditional equal protection test that the classification bore a reasonable (rational) relationship to the object of the legislation. The United States Supreme Court dismissed an appeal "for want of a substantial federal question", 405 *U. S.* 950, 92 S. Ct. 1173, 31 *L. Ed.* 2d 227 (1972), in spite of the fact that the appellant's brief asserted that "* * * the right to live where a citizen chooses is a fundamental personal liberty that cannot be abridged by a mere showing that a residency ordinance may be reasonably related to a proper city purpose". See Goldstein, "Residency Requirements For Municipal Employees: Denial of a Right to Commute?" 7 *U. San Francisco L. Rev.* 508, 530 *n.* 77 (1973).

In *Memorial Hospital, supra,* the court found the "travel" rationale of *Shapiro* to call for striking down a durational residence test for free hospital care for the indigent, that rationale extending to penalization of interstate travel after it occurred as well as to chilling its exercise beforehand. 415 *U. S.* at 258, 94 S. Ct. at 1082, 39 *L. Ed.* 2d at 315. Although the residence requirement was applicable in terms to the county where the hospital was situated, the court held that the effect nevertheless was to penalize the interstate

migration of the particular individual whose hospitalization gave rise to the litigation, thus coming within the *Shapiro* rule and calling for a showing of a justificatory state interest of "compelling" dimensions. *Id.,* at 253–261, 94 S. Ct. at 1080–1083, 39 *L. Ed.* 2d at 313, 315. The court expressly left open the matter of any distinction between interstate and intrastate travel in this regard.[3] *Id.,* 255, 256, 94 S. Ct. at 1081, 39 *L. Ed.* 2d at 313.

The California Supreme Court even prior to *Memorial Hospital* rejected the notion that *Shapiro* precludes a simple continuous residence requirement for municipal employment. *Ector v. City of Torrance,* 10 Cal. 3d 129, 109 *Cal. Rptr.* 849, 514 *P.* 2d 433 (1973),[4] *cert.* den. 415 *U. S.* 935, 94 S. Ct. 1451, 39 *L. Ed.* 2d 493 (1974). The issue was the validity of a city charter which required all officers and employees of the city to become residents within six months of their employment except that the city could waive the requirement as to appointive officers or employees "having technical, special or professional knowledge or abilities". Among other things, the plaintiff charged that the city was required to show a "compelling" governmental interest to

---

[3]Two federal appellate courts have assumed that a durational residence requirement not serving a compelling state interest would fall, on the impairment of travel theory, even if the requirement was as to municipal rather than state residence. So held in *Cole v. Housing Authority of City of Newport,* 435 *F.* 2d 807 (1st. Cir. 1970) as to a two-year residence requirement for admission to tenancy in public housing, and in *King v. New Rochelle Municipal Housing Authority,* 442 *F.* 2d 646 (2d Cir. 1971), *cert.* den. 404 *U. S.* 863, 92 S. Ct. 113, 30 L. Ed. 2d 107 (1971), as to a similar five-year requirement. These cases may well be correct in result, although from *Memorial Hospital, supra,* it would appear they were incorrect in interpreting *Shapiro* as proclaiming a "fundamental right" in respect of *intrastate* travel. The same may be said as to *Eggert v. City of Seattle,* 81 *Wash.* 2d 840, 505 *P.* 2d 801 (S. Ct. 1973), which held invalid, on travel grounds, a preference for municipal employment for those residing in the municipality at least one year.

[4]The California Court of Appeal had held to the contrary. 28 *Cal. App.* 3d 293, 104 *Cal. Rptr.* 594 (1973).

support the charter provision in view of its impairment of the "fundamental" "right to travel", citing *Shapiro* and other federal cases. The court rejected the argument. It first took the position that the dismissal for want of a substantial federal question by the Supreme Court in the *Detroit Police* case, *supra*, signified the absence of any equal protection deficiency in a municipal employee residence requirement. (109 Cal. Rptr. at 852, 514 *P.* 2d at 436). In that regard it also cited *Ahern v. Murphy*, 457 *F.* 2d 363 (7th Cir. 1972). Furthermore, it saw the substance of plaintiff's claim, realistically, as simply a "right to commute" from home outside the city to place of employment in the city, 109 Cal. Rptr. at 852, 514 *P.* 2d at 436, not comparable with the right to "migrate among the several states", vindicated in *Shapiro* as against a state law which would frighten a would-be migrant with the prospect "of being denied welfare if a job is not immediately available". *Id.,* 109 Cal. Rptr. at 852, 514 P. 2d at 436–437.

The California court also distinguished *Shapiro,* as well as the federal appellate decisions in *King* and *Cole,* both *supra,* as invalidating not a continuing residence requirement as such but a *durational* residence requirement — one which subjected a new *resident* to a substantial waiting period before he could apply for such essentials of living to impecunious people as welfare benefits or access to public low-cost housing. 109 Cal. Rptr. at 853, 514 *P.* 2d at 437. As to the plaintiff's assertion that the charter impinged on his general right to establish his home where it best suited him, and on the personal privacy inherent in such decisions, Justice Mosk responded with a quotation of Chief Justice Weintraub's aphorism in *Kennedy,* quoted above, that "The question is not whether a man is free to live where he will. Rather the question is whether he may live where he wishes and at the same time insist upon employment by government". (29 *N. J.* at 183). 109 Cal. Rptr. at 853, 514 *P.* 2d at 437.

The court found that a municipal employment residence requirement bears a rational relationship to one or more legitimate state purposes and is therefore valid under the traditional equal protection test, citing *Kennedy, supra,* among numerous other decisions on the point. 109 Cal. Rptr. at 852, 514 *P.* 2d at 436.

We are in thorough accord with the views of the California Supreme Court in *Ector* as thus summarized.

Appellant relies on *Krzewinski v. Kugler,* 338 *F. Supp.* 492, 497–498 (D. N. J. 1972) and *Donnelly v. City of Manchester,* 111 *N. H.* 50, 274 *A.* 2d 789 (S. Ct. 1971). Both of these cases are in point, as involving municipal employment residence requirements. Both cite *Shapiro* as authority for the view that such requirements impair the right to travel. *Krzewinski* imposed upon the municipality the burden of demonstrating a "compelling" state interest to justify the impairment but found such an interest to exist (where the residence requirement was as to police officers); *Donnelly* did not in terms impose the compelling state interest test but rather weighed the "reasonableness of a restriction upon private rights" against the "importance of the public benefit" (274 *A.* 2d, at 791), and found the restriction invalid.

Both *Krzewinski* and *Donnelly* suffer as precedents pertinent here in the light of their failure to appreciate the limited effect of *Shapiro,* as explicated subsequently in *Memorial Hospital,* (a) as elevating the right of travel to "fundamental" status only in respect of the right of migration between states; and (b) as expressly abnegating any hostile view of the validity of a simple (non-durational) residence requirement in an appropriate case.

When the thesis of impairment of a "fundamental" right of travel by a municipal employment residence requisite is seen as stripped of supporting federal constitutional precedent, and it is appraised on its inherent merits, it is found to lack weight. The undeniable general right of

people to live near but outside the boundaries of a city in whose government they aspire to be employed is, realistically, not equatable with the right to travel throughout the land vouchsafed by the federal constitution to all United States citizens, *Paul v. Virginia,* 75 *U. S.* (8 Wall.) 168, 19 *L. Ed.* 357 (1869); nor even, sensibly conceived, with the right to travel at all, but rather, as bluntly stated in *Kennedy,* merely the common right to live where one will. The same applies to city employees residing in the city but aspiring to move elsewhere, yet near enough to commute to their city jobs. The "right" involved is subordinate to a rational municipal policy to restrict employment to residents.

There are any number of conceivable rational warrants in municipal public policy to justify vetoing the desire of the municipal employee to live outside the city while working for it. Justice Mosk in *Ector, supra,* listed those advanced in various adjudicated cases and by the *amici* in that case (109 Cal. Rptr. 852, 514 *P.* 2d 436):

> Among the governmental purposes cited in these decisions or now urged by amici curiae are the promotion of ethnic balance in the community; reduction in high unemployment rates of inner-city minority groups; improvement of relations between such groups and city employees; enhancement of the quality of employee performance by greater personal knowledge of the city's conditions and by a feeling of greater personal stake in the city's progress; diminution of absenteeism and tardiness among municipal personnel; ready availability of trained manpower in emergency situations; and the general economic benefits flowing from local expenditure of employees' salaries.

Several of the thus listed local policy interests, not mentioned in the 1959 climate of the *Kennedy* opinion, are expressly relied upon by the City of Newark in the instant litigation, and we deem them pertinent in today's crisis of the cities. We have particular reference to the interest of a city like Newark in promoting employment of its residents, rates of unemployment therein substantially exceeding gen-

eral levels. In short, there are one or more substantial rational justifications for the policy of such an ordinance sufficient to outweigh such adverse impact as it may have either upon aspirants to municipal employment or those already in the municipal employ.

It should be emphasized that this court does not take sides in the broad policy debate whether restrictive residential ordinances of this type, on the whole, do more harm than good in today's urbanized society. See Goldstein, *op. cit. supra* (7 *U. San Francisco L. Rev.* at 509–510). The statutory local option in the case of employees (as distinguished from officers) vests the policy choice in the municipal legislature, not the courts. Some municipalities, like Newark, have deemed it consonant with local policy to exercise the option.[5] We hold they may validly do so free of any constitutional interdiction. We adhere to *Kennedy.*

## II.

Appellant asserts, and we agree, that the "special circumstances" exception in the ordinance is void for absence of "adequate standards to guide the discretion" of the responsible official. *Moyant v. Paramus,* 30 *N. J.* 528, 553 (1959); 5 *McQuillin, Municipal Corporations* (1969) § 18.12, p. 362 *et seq.* There is not the remotest clue in the language of the exception, or in the remainder of the ordinance, to suggest what "special circumstances" the draftsman of the provision had in mind. The opacity of the lan-

---

[5]The pervasiveness of that policy is indicated by the fact that employees (as distinguished from officers) are required to be residents in 55.7% of the employing municipalities throughout the country. Goldstein, *op. cit. supra* (7 *San Francisco L. Rev.* at 511, n. 11). In many additional municipalities the requirement extends also to officers, appointed or elected. *Ibid.*

*Hanson v. Unified Sch. Dist. No. 500, Wyandotte Cty., Kan.,* 364 *F. Supp.* 330 (D. Kan. 1973) holds invalid, on equal protection grounds only, a school district regulation requiring school teachers to reside in the district. This, like *Donnelly v. City of Manchester, supra,* is probably a minority view.

guage stands in contrast with the specificity of the other two exceptions, *viz.*, where the health of the employee or the nature of the employment requires outside residence.

The city argues that the specific interpretation said to be uniformly accorded the special circumstances exception, pursuant to its construction by the city corporation counsel, eliminates the facial vagueness of the standard. The meaning attributed to the provision by that official was, "special talent or technique which is necessary for the operation of government not found among Newark residents." Were that standard expressed in the ordinance it would probably suffice. See *Ector v. City of Torrance, supra* (109 Cal. Rptr. at 854, 514 *P.* 2d at 438). But we cannot supply, on the basis of an *ad hoc* construction by the corporation counsel, what neither the language nor the general setting of the critical provision against the background of the ordinance expresses or fairly implies. The generality of this exception affords leeway for gross abuse in the even-handed administration of the residence requirement. The exception is invalid.

■ We find no reason, however, to strike the whole ordinance because of the invalidity of a relatively minor provision of the entirety. *Cf. Yanow v. Seven Oaks Park, Inc.,* 11 *N. J.* 341, 360–362 (1953). The remainder of the ordinance is severable and survives.

## III

■ We cannot find a sufficiently clear demonstration by appellant of discriminatorily selective enforcement of the ordinance against her. The ordinance was invoked against another secretarial employee in the Law Department at the same time as against appellant. The mere fact that the director of the Law Department undertook a thorough enforcement of the residence requirement in his own department in 1970 does not, absent any evidence of a deliberate policy of non-enforcement by the directors of the other city depart-

ments, or by the city administration as a whole, establish invidious discriminatory enforcement by the city as against appellant. *Cf. Kennedy v. City of Newark, supra,* where, despite a showing that in 1955 585 employees were in violation of the ordinance (29 *N. J.* at 183) and that the City admitted that up to that time no one had been discharged for non-residence (*Id.* at 192), the city was not barred from commencing to enforce the ordinance on January 1, 1957. The court said (*Ibid.*): "There is no evidence of a studied policy not to enforce the ordinance * * *. Quite obviously, the missing link is official knowledge of violations of the ordinance. One may suspect some laxity, but the testimony is barren of proof."

■■ The general rule is that a municipality is not precluded or estopped from enforcing an ordinance merely because certain persons have been permitted to violate it without prosecution. 56 *Am. Jur.* 2d *Municipal Corporations* (1971) § 421, p. 460; and see *Oyler v. Boles,* 368 *U. S.* 448, 456, 82 S. Ct. 501, 7 *L. Ed.* 2d 446 (1962). While appellant did establish here that upon a random selection of 142 employee records (we may take judicial notice that the City has a far greater number of employees than that) 21 persons, exclusive of nine excepted lawyers, were found to be non-residents, there was no evidence that their department heads knew them to be such; nor that non-resident employees in other departments had not been discharged in the past. And for all this record shows to the contrary, the employing officers of the city may in the past have disqualified non-resident applicants for city employment. The corporation counsel testified that he had done so in his department. The burden of demonstrating such individous discriminatory enforcement of the ordinance by the city as would render it powerless to enforce it against appellant is upon her, and the burden has not been met.

Needless to say, our holding in this regard will be no excuse for continued non-enforcement of the ordinance in the future if in fact that has been the case in the past. There

are both civil and criminal sanctions for willful nonfeasance in office.

The order of the Civil Service Commission is affirmed; no costs.

CLIFFORD, J. (concurring). It is difficult to escape the impression that we are reviewing this case with blinders on. Since plaintiff elected not to brief or argue the issue, we in turn do not resort to our peripheral vision to examine the interaction of the ordinance in question with the statutes excepting certain municipal employees from the residence requirement. At footnote 1, *ante,* (p. 64, *n.* 1) the majority takes note of *N. J. S. A.* 40:46–14, requiring "officers" of municipalities to reside therein but excepting "counsel, attorney, engineer or health officer;" its successor statute effective July 1, 1971, *N. J. S. A.* 40A:9–1. excepting, in addition, an "auditor or comptroller;" and *N. J. S. A.* 40A:15–9.1 and 40A:14–122.1, under which municipalities are forbidden to impose the residence requirement on policemen or firemen. The same footnote properly observes that "[a]ppellant has not raised any question as to the construction of any of these statutes or as to the validity of the exceptions or exemptions contained therein, either separately or taken in conjunction with the Newark ordinance."

While the Court has thus made the point, I deem it worth emphasizing that at least as far as my vote to affirm is concerned there should not be read into it any decision on whether the residence requirement here has been "uniformly applied" when considered in connection with the statutes referred to above. See *Memorial Hospital v. Maricopa County,* 415 *U. S.* 250, 255, 94 S. Ct. 1076, 1081, 39 *L. Ed.* 2d 306, 313, quoting *Dunn v. Blumstein,* 405 *U. S.* 330, 342, 92 S. Ct. 995, 1003, 31 *L. Ed.* 2d 274, 284, *n.* 13, (1972). It might very well be argued that the pattern of discrimination which emerges from that broader view of the case would be most difficult to sustain under a rational basis test and certainly under a compelling state interest test.

Some peculiar combinations come to mind: school teachers, legal secretaries, sanitation men and physicians must live in the city, while auditors, policemen and firemen need not.

I express no more than a mild curiosity as to why the question has not been raised (speculating, at the same time, on whether plaintiff was apprehensive of winning the battle but losing the war — this by gaining a declaration that the ordinance in question, read with the statutes, is unconstitutional, thereby prompting the legislature to repeal the exemption statutes, in response to which the City of Newark might thereafter pass an all-embracing, uniformly applied, bona fide residence requirement ordinance. On reflection this seems attenuated but not inconceivable.).

I underscore our limited perspective without dwelling further on it. I concur in the judgment of affirmance and in the Court's opinion, given the narrow posture in which the issue is presented.

PASHMAN, J. (dissenting). I would declare the residence ordinance unconstitutional on two grounds: (1) it is an infringement upon the right to travel unsupported by a sufficiently compelling State interest to justify the restriction and (2) it is a violation of the equal protection clause. I therefore dissent from the majority opinion.

I

The enactment prescribes a continuing residence requirement in the community as a condition of employment. Its validity was sustained in *Kennedy v. City of Newark*, 29 *N. J.* 178 (1959). In balancing personal liberty against the power to enact an ordinance requiring residence in an employer-city, this Court invoked the rational basis test.

* * * If there is a rational basis for a residence requirement in furtherance of the public welfare, the constitutional issue must be resolved in favor of the legislative power to ordain it. * * * (29 *N. J.* at 183).

It was thought that the government could quite rationally and reasonably conclude that employees would perform their respective tasks more conscientiously if they had an attachment to the community which exceeded mere employment. Employees would be more motivated and would have greater incentive to perform their duties well if they lived in the community. They could not leave the city's problems behind them after working hours. While this reasoning is still sound, the standard for evaluating its validity has been altered.

Subsequently to *Kennedy v. City of Newark,* the United States Supreme Court held that "any classification which serves to penalize the exercise of [a constitutional] right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." *Shapiro v. Thompson,* 394 *U. S.* 618, 634, 89 *S. Ct.* 1322, 1331, 22 *L. Ed.* 2d 600, 615 (1969). We are now called upon to reconsider the *Kennedy* decision in light of the test set forth in *Shapiro.*

New Jersey has recognized the compelling state interest test for purposes of the Federal Constitution and has embraced the doctrine for State purposes. Justice Jacobs stated in *Worden v. Mercer County Board of Elections,* 61 *N. J.* 325, 346 (1972):

\* \* \* Since it is so patently sound and so just in its consequences, we adopt the compelling state interest test in its broadest aspects, not only for compliance with the Federal Constitution but also for purposes of our own State Constitution and legislation \* \* \*.

Newark claims that we have since retreated from our endorsement of the compelling state interest test in *Worden v. Mercer County Board of Elections.* It was noted that in *Robinson, et al. v. Cahill, et al.,* 62 *N. J.* 473 (1973), we expressed our dissatisfaction with the rather elusive concepts of "fundamental" rights and "compelling" interests. While our treatment of the equal protection question presented therein embraced the terms of those concepts, the Court did express some reluctance in accepting the overall concept

for State constitutional purposes. 62 *N. J.* at 491. Chief Justice Weintraub continued:

In passing we note briefly the reason why we are not prepared to accept that concept for State constitutional purposes . . . But we have not found helpful the concept of a "fundamental" right. No one has successfully defined the term for this purpose. Even the proposition . . . that a right is "fundamental" if it is explicitly or implicitly guaranteed in the Constitution, is immediately vulnerable, for the right to acquire and hold property is guaranteed in the Federal and State Constitutions, and surely that right is not a likely candidate for such preferred treatment. And if a right is somehow found to be "fundamental," there remains the question as to what State interest is "compelling" and there, too, we find little, if any, light. Mechanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. *Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary.* In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial. * * * (62 *N. J.* at 491–492) (Emphasis added).

In *Robinson,* the Court was justifiably hesitant to ground its holding upon the equal protection clause. As noted in deciding that case, "the equal protection clause may be unmanageable if it is called upon to supply categorical answers to the vast area of human needs, choosing those which must be met and a single basis upon which the State must act." 62 *N. J.* at 492. The Court went on to hold the then practice of financing public education with local property taxes as violative of the State constitutional mandate for a "thorough and efficient system of free public schools." 62 *N. J.* at 513. The Court was not content to ground an analysis of so complex and pervasive an issue as the financing of public education solely on the relatively imprecise standards of the compelling interest test.

While the quoted passage in *Robinson v. Cahill* indicates some dissatisfaction with ambiguities inherent in the compelling state interest test, it does not adopt a new standard, but sets out what implicitly was the ultimate judgment

called for: weighing the nature of the restraint against the purpose served. Judged under either the traditional compelling state interest test or the test suggested in *Robinson v. Cahill*, the Newark Residence Ordinance cannot be upheld as to the broad inclusion of all employees being required to live within the City.[1]

* * * We do not say that there are no employees whose residence near their place of duty may not be important enough to justify a restriction upon their place of residence but if such restrictions are permissible as to some this does not justify the broad and all inclusive requirement that all employees live within the city limits. * * * (*Donnelly v. City of Manchester*, 111 *N. H.* 50, 274 *A.* 2d 789, 791 (Sup. Ct. 1971)).

*Shapiro v. Thompson, supra,* invalidated durational residence requirements for welfare aid eligibility. They were held to violate the equal protection clause of the Fourteenth Amendment by creating two classes of bona fide residents solely on the basis of length of residence.

* * * On the basis of this sole difference the first class [those who have resided a year or more] is granted and the second class [those who have resided less than a year] is denied welfare aid upon which may depend the ability of the families to obtain the very means to subsist — food, shelter, and other necessities of life. * * * (394 *U. S.* at 627, 89 S. Ct. at 1327, 22 *L. Ed.* 2d at 611).

Deterrence of "in-migration" was an essential feature of the residence requirement, the validity of which could not be justified as protecting the fiscal integrity of assistance programs, distinguishing between new and old residents on the basis of tax contributions made to the community,

---

[1]This holding does not reach the question of the residence of officers. See *N. J. S. A.* 40A:9–1.

As to the distinction between officers and employees, see *State v. Indelicato*, 87 *N. J. Super.* 566 (Law Div. 1965) ; 3 *McQuillin, Municipal Corporations*, §§ 12.29–12.30; Glasser, "A New Jersey Municipal Law Mystery: What Is A 'Public Office?' ", 6 *Rutgers L. Rev.* 503 (1952).

facilitating planning the budget, providing an objective test of residence, minimizing the possibility of fraud or encouraging early entry into the labor force. In practical terms, the waiting period excluded the poor from the relevant jurisdiction. This exclusion was an impermissible restriction on the right to travel.

> This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement.
>
> \*      \*      \*      \*      \*      \*      \*      \*
>
> Thus, the purpose of deterring the in-migration of indigents cannot serve as justification for the classification created by the one-year waiting period, since that purpose is constitutionally impermissible. \* \* \* (394 *U. S.* at 629, 631, 89 S. Ct. at 1329, 22 *L. Ed.* 2d at 612, 613).

It is not permissible to "wall welfare recipients out." *Demiragh v. DeVos,* 476 *F.* 2d 403, 405–406 (2 Cir. 1973). See *Edwards v. California,* 314 *U. S.* 160, 62 *S. Ct.* 164, 86 *L. Ed.* 119 (1941).

Shapiro involved a durational rather than a continuing residence requirement. The former is a condition precedent for obtaining the desired benefit, while the latter creates a condition which often may be met upon obtaining the benefit or within some time period thereafter, but is a condition of one's retention of the benefit or position. The court specifically disavowed any intention to judge the validity of other durational or continuing residence requirements.

> We imply no view of the validity of waiting period or residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession, to hunt or fish, and so forth. Such requirements may promote compelling state interests on the one hand, or on the other, may not be penalties upon the exercise of the constitutional right of interstate travel. (394 *U. S.* at 638, n. 21, 89 S. Ct. at 1333, 22 *L. Ed.* 2d at 617, n. 21).

The right to travel and equal protection clause have been the basis of invalidating durational residency requirements in the context of eligibility for public housing, *King v. New Rochelle Municipal Housing Authority,* 442 *F.* 2d 646 (2 Cir.), *cert.* denied 404 *U. S.* 863, 92 *S. Ct.* 113, 30 *L. Ed.* 2d 107 (1971), *Cole v. Housing Authority of City of Newport,* 435 *F.* 2d 807 (1 Cir. 1970); exercising one's right to vote, *Dunn v. Blumstein,* 405 *U. S.* 330, 92 *S. Ct.* 995, 31 *L. Ed.* 2d 274 (1972); preference given applications for civil service positions, *Eggert v. City of Seattle,* 81 *Wash.* 2d 840, 505 *P.* 2d 801 (Sup. Ct. 1973); and an indigent's right to receive non-emergency medical care, *Memorial Hospital v. Maricopa County,* 415 *U. S.* 250, 94 *S. Ct.* 1076, 39 *L. Ed.* 2d 306 (1974).

As in the other durational residence requirement cases, the discrimination in *Memorial Hospital v. Maricopa County, supra,* was between new and old bona fide residents. The case arose from the denial of a transfer from and reimbursement for services to a private county hospital for its care of an indigent who had moved to Maricopa County, Arizona, from New Mexico. The requirement must be justified by a compelling state interest since the classification impinged on the "constitutionally guaranteed right of interstate travel." 415 *U. S.* at 254, 94 *S. Ct.* at 1080, 39 *L. Ed.* 2d at 312. While not dealing directly with the interstate-intrastate travel distinction, the court noted that such a distinction would not affect the requirement before it.

* * * Appellant Evaro has been effectively penalized for his interstate migration, although this was accomplished under the guise of a county residence requirement. What would be unconstitutional if done directly by the State can no more readily be accomplished by a county at the State's direction. * * * (415 *U. S.* at 256, 94 S. Ct. at 1081, 39 *L. Ed.* 2d at 313).

The Court relied on the Arizona Supreme Court's construction of the statute as applicable to intrastate as well as interstate migrants, yet noted the inconsistency of applying

the residence requirement to intrastate migrants while being prohibited from doing so for interstate migrants. *Memorial Hospital v. Maricopa County,* 415 *U. S.* at 256, n. 9, 94 S. Ct. at 1081, n. 9, 39 *L. Ed.* 2d at 313–314, n. 9.[2]

In any event, the right to travel encompasses intrastate as well as interstate travel.

It would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state. \* \* \* [Footnote omitted]. (*King v. New Rochelle Municipal Housing Authority, supra,* 442 *F.* 2d at 648).

*Kent v. Dulles,* 357 *U. S.* 116, 125–126, 78 *S. Ct.* 1113, 1118, 2 *L. Ed.* 2d 1204, 1210 (1958); *Krzewinski v. Kugler,* 338 *F. Supp.* 492, 498 (D. N. J. 1972); *Wellford v. Battaglia,* 343 *F. Supp.* 143, 147–148 (D. Del. 1972), aff'd, 485 *F.* 2d 1151 (3 Cir. 1973); *Karp v. Collins,* 310 *F. Supp.* 627, 633–634 (D. N. J. 1970); *Donnelly v. City of Manchester, supra,* 274 *A.* 2d at 791; *Eggert v. City of Seattle,* 81 *Wash.* 2d 840, 505 P. 2d 801, 804 (Sup. Ct. 1973). The right to live where one chooses is inherently part of any right to travel. See *Donnelly v. City of Manchester, supra,* 274 A. 2d at 791.

The right to travel is penalized as effectively in the case now before this Court as in those cases invoking durational residence requirements. The requirement is a clear deterrent to any city employee desiring to reside beyond the city limits. The ordinance forbids such movement on penalty

[2]The Supreme Court in *Shapiro* did not specifically ascribe the right to travel to a particular provision of the Constitution, leading one to believe that the right is a personal liberty, rather than a benefit linked to the interstate commerce clause. However, even if the right to travel was an extension, for federal purposes, of the commerce power, cities may not be able to collectively accomplish what a state would be prohibited from doing. See *Eggert v. City of Seattle, infra,* 505 *P.* 2d at 804; Note, "Residence Requirements After *Shapiro v. Thompson,*" 70 *Col. L. Rev.* 134 (1970).

of loss of employment in violation of both the State[3] and Federal Constitutions. It is evident that residence requirements have an inhibiting effect on interstate movement, if only to the extent that nonresidents are precluded from seeking employment with the city unless they seek also to reside therein. "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] amendment to secure." *Truax v. Raich,* 239 *U. S.* 33, 41, 36 *S. Ct.* 7, 10, 60 *L. Ed.* 131, 135 (1915). "Any limitation on the opportunity for employment impedes the achievement of economic security, which is essential for the pursuit of life, liberty and happiness. . . ." *Purdy & Fitzpatrick v. State,* 71 *Cal.* 2d 566, 79 *Cal. Rptr.* 77, 86, 456 *P.* 2d 645, 654 (Sup. Ct. 1969).

It is my conclusion that the Newark ordinance seriously interferes with the constitutional right to travel inter- and intrastate which leads me to strictly scrutinize the State's interest. The majority fails to perceive the potential deterrent to migrating and resettling which the residence ordinance represents to both those presently in the city's employ and those seeking employment with the city. The mere fact that the ordinance herein prescribes a continuing, rather than a durational, residence requirement does not exempt it from the potential of unconstitutionally interfering with the right to travel. See generally, Goldstein, "Residency Requirements For Municipal Employees: Denial Of A Right To Commute?", 7 *U. San Fran. L. Rev.* 508, 526–540 (1973).

It has been noted that "durational residence laws single out the class of bona fide state and county residents who have recently exercised this constitutionally protected right, and penalize such travelers directly." *Dunn v. Blumstein,*

---

[3] *N. J. Const.*, Art. I, ¶ 1.

*supra,* 405 *U. S.* at 338, 92 S. Ct. at 1001, 31 *L. Ed.* 2d at 282. The Court noted that "appropriately defined and uniformly applied requirements of bona fide residence may," in the case of voters, "be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny." 405 *U. S.* at 343–344, 92 S. Ct. at 1004, 31 *L. Ed.* 2d at 285. This Court has already recognized the "political philosophy of local representation of the citizens . . ." in upholding a continuing residence requirement for ward councilmen. *Krulish v. Evans,* 16 *N. J.* 200, 203 (1943). *Cf. Wellford v. Battaglia, supra.* It is by no means suggested that continuing residence requirements are *per se* invalid. See *Krzewinski v. Kugler, supra.*

What we are faced with here is a stenographer, an employee of the city government, who was dismissed from her position because of noncompliance with the residency ordinance. Her inability to comply was based upon an expressed concern about the crime rate, her inability to find acceptable housing at her income level, and her attempt at reconciliation with her husband, who lived in Union, N. J. Lest this be misunderstood, it should be emphasized that this dissent is not an effort to justify urban flight to the suburbs or an abandonment of the future of our cities. My beliefs are completely to the contrary. However, it is not constitutionally permissible for the city to wall in its employees as a measure to increase concern for the community. The myriad of social ills with which the city is plagued does not serve to legitimize the parochial concept of restricting employment to residents where a compelling interest is the standard for judgment. This is particularly so where the Legislature has since expressed its dissatisfaction with residence requirements where a more compelling interest has been shown to exist.[4]

---

[4]In *Krzewinski v. Kugler,* 338 *F. Supp.* 492 (D. N. J. 1972), the court applied the compelling state interest test to *N. J. S. A.* 40:47–

In *Shapiro,* welfare payments were considered a basic
necessity of life. In *Memorial Hospital v. Maricopa County,
supra,* 415 *U. S.* at 259, 94 S. Ct. at 1082, 39 L. Ed. 2d at
315, medical care was deemed equally as basic. The state
had not shown that the durational residence requirement was
"legitimately defensible" in furthering a compelling state
interest. None of the purposes asserted as justification for
the requirement — protecting the county's fiscal integrity
and budget predictability, preventing the dilution of services
for longtime residents who have contributed to the com-
munity particularly by paying taxes, inhibiting migration of
indigents, generally deterring indigents from taking up
residence in the county solely to utilize the medical facilities
and prevention of fraud — satisfied the state's burden of
justifying the necessity to impinge on constitutionally pro-
tected interests.

5, requiring policemen and firemen to reside in the municipality in
which they were employed. In following the *Shapiro* test, and rec-
cognizing the fundamental nature of the right to travel, the court up-
held the statute. The necessity for a police officer's or fireman's
identity with the community, the effect of his physical presence, and
the benefits of chance encounters which follow from residence, were
deemed sufficiently compelling to justify an interference with the
right to travel.

Legislative relief was not long in coming. *N. J. S. A.* 40:47–5 was
repealed by *L.* 1971, c. 197 (§ 40A:14–176), effective July 1, 1971.
Furthermore, *N. J. S. A.* §§ 40A:14–9.1 and 40A:14–122.1, effective
February 15, 1971, prohibit municipalities from making residence
therein a condition of employment for firemen and policemen. This
expression of legislative policy appears to imply dissatisfaction with
the current requirement of Newark *R. O.* 2:14–1 in that the reasons
for requiring residency for firemen and policemen are much stronger
than those for clerical personnel. *Detroit Police Officers' Ass'n v.
City of Detroit,* 385 *Mich.* 519, 190 *N. W.* 2d 97 (Sup. Ct. 1971),
appeal dismissed, 405 *U. S.* 950, 92 *S. Ct.* 1173, 31 *L. Ed.* 2d 227
(1972), cited by the majority is distinguishable from the case now
before this Court for the same reasons as noted above for *Krzewinski
v. Kugler.* While police officers have been held to be "officers" of a
municipality, *Mercadante v. City of Paterson,* 111 *N. J. Super.* 35
(Ch. Div. 1970), aff'd, 58 *N. J.* 112 (1971), the residency require-
ment for them may be more valid even if they were considered em-
ployees, for the necessary compelling state interest is more realistic
and meaningful.

In *Kennedy v. City of Newark, supra,* the Court upheld the ordinance after concluding that its constitutionality rested on several rational bases:

* * * Government may well conclude that residence will supply a stake or incentive for better performance in office or employment and as well advance the economy of the locality which yields the tax revenues. * * * (29 *N. J.* at 184).

In *Ector v. City of Torrance, infra,* the Supreme Court of California relied upon various similar bases to justify the constitutional infringement.

Among the governmental purposes cited in these decisions or now urged by amici curiae are the promotion of ethnic balance in the community; reduction in high unemployment rates of inner-city minority groups; improvement of relations between such groups and city employees; enhancement of the quality of employee performance by greater personal knowledge of the city's conditions and by a feeling of greater personal stake in the city's progress; diminution of absenteeism and tardiness among municipal personnel; ready availability of trained manpower in emergency situations; and the general economic benefits flowing from local expenditure of employees' salaries. We cannot say that one or more of thse goals is not a legitimate state purpose rationally promoted by the municipal employee residence requirement here in issue. (10 *Cal.* 3d at 135, 109 Cal. Rptr. at 852, 514 *P.* 2d at 436).

Let us evaluate the validity of these state purposes. Just as it is unconstitutional to apportion economic benefits according to a citizen's tax contribution, *Shapiro v. Thompson, supra,* 394 *U. S.* at 633–634, 89 S. Ct. at 1330–1331, 22 *L. Ed.* 2d at 614, the city cannot rely upon the "public coffer" theory to require residency to recirculate salaries "within the economy of the municipality that pays those salaries." *Krzewinski v. Kugler, supra,* 338 *F. Supp.* at 498–499, n. 4. While recognizing the compelling interest of the municipality in requiring policemen and firemen to live within municipal borders, the availability of trained manpower for emergencies was not considered a legitimate justification.

* * * The capacity of police and firemen for emergency response is not necessarily impaired by residency outside municipal bounds because, as plaintiffs argue, geographical proximity cannot logically be equated with municipal borders. The state interest in proximity might be satisfied much more rationally and fairly by a time or distance radius computation. Setting the bounds for residence at the city limits is not compelled by a valid state interest in proximity and approaches being arbitrary. (*Krzewinski v. Kugler*, 338 *F. Supp.* at 499, n. 6).

Similarly, *Ector's* concern with absenteeism and tardiness cannot even be a rational basis for residence requirements, let alone provide a compelling interest. The reduction in unemployment among inner-city minority groups relates to those whom the city hires, and not the requirement that employees live in the city. The remaining compelling statements urged to justify this constitutional infringement are the promotion of ethnic balance, improving relations between employees and residents, and enhancing the incentive for performance of employees. While they may be desirable objectives, not one of them individually or all of them collectively present so compelling an interest as to transcend a constitutional right.

The court in *Krzewinski v. Kugler, supra,* noted the rioting and looting that had taken place in Newark in 1967 and attributed "much of this lawlessness to a deeply rooted disrespect for an absentee police force. . . ." 338 *F. Supp.* at 499. Even after the court recognized as compelling the interests underlying residency requirements for policemen and firemen, *Krzewinski v. Kugler, supra,* the Legislature enacted *L.* 1972, *c.* 3, Secs. 1 and 11, *N. J. S. A.* 40A:14.9–1 and 40A:14–122.1, prohibiting municipalities from requiring policemen and firemen to reside within their employer municipality and indicating that it did not consider their residence so compelling as to justify residence requirements. The majority now tells us that even though the Legislature does not deem it necessary to require policemen and firemen to reside in a municipality, it is still necessary and compelling for a stenographer to so reside.

Other jurisdictions do not agree. The Supreme Court of New Hampshire held unconstitutional an ordinance requiring all classified employees of the city, including school teachers, to live in their employer municipality unless granted a special permit. *Donnelly v. City of Manchester,* 111 *N. H.* 50, 274 *A.* 2d 789 (Sup. Ct. 1971). Such permits could be granted only "for extreme financial hardship, shortage of housing, or health reasons." 274 *A.* 2d at 790.[5] The court, while recognizing that some impairment of private rights may be permitted, applied the following test:

* * * In passing upon the reasonableness of a restriction upon private rights the importance of the public benefit is balanced against the seriousness of the restriction of the private right sought to be imposed. * * * (274 *A.* 2d at 791).

After noting that the right of every citizen to live where he chooses and travel freely within and across state boundary lines, the court stated that it had no doubt that the residence ordinance restricted the fundamental rights of city employees. While carefully indicating that some employees whose residence "near their place of duty" may be important enough to justify a restriction on their residence, the court noted that this possibility did not justify the "broad and all inclusive requirement that all employees live within the city limits." 274 *A.* 2d at 791.

Similarly, the court invalidated a school district regulation requiring residence within the county in *Hanson v. Unified Sch. Dist. No. 500, Wyandotte Cty., Kan.,* 364 *F. Supp.* 330 (D. Kan. 1973). While the court based its decision on a violation of the equal protection clause, and disclaimed an infringement on the right to travel, it noted at 332:

---

[5]The Newark ordinance provides exceptions when: (a) the health of any officer or employee necessitates residence outside of the city limits; (b) the nature of the employment is such as to require residence outside of the city limits; (c) special circumstances attach permitting residence outside of the city limits.

In effect, the school board's regulation requires the plaintiffs to choose between their rights to live and to work where they desire. They may either live outside Wyandotte County or they may teach in the school district within the county. They may not, however, do both. [Citation omitted.]

In rejecting the "right-privilege" argument and "public interest" in expending school district revenues for salaries of residents, the court first noted the decreasing importance of local revenues in school financing in Kansas. See *Robinson v. Cahill, supra.* Secondly, it pointed out that any contribution of residents to the local tax base was "infinitesimal when compared to the interference with plaintiff's rights," citing *Donnelly v. City of Manchester, supra* (364 *F. Supp.* at 333). The court took note that teachers were certified by the state (appellant in the case before this Court is in the Civil Service) and would presumably be qualified to teach anywhere in the state. While the residence requirement was a laudable one, the classification here was "much too crude" to meet the avowed purpose.

No person has a vested right to be employed by the state. See *Slochower v. Board of Ed. of N. Y.*, 350 *U. S.* 551, 555–556, 76 *S. Ct.* 637, 639–640, 100 *L. Ed.* 692, 699 (1956). The absence of a right to public employment, however, does not give rise to a state's ability to "condition a privilege which it may deny altogether on the surrender of a constitutional right." *Kutcher v. Housing Authority of City of Newark*, 20 *N. J.* 181, 188–189 (1955). See *Donnelly v. City of Manchester, supra,* 274 *A.* 2d at 791; *Bagley v. Washington Township Hospital District,* 65 *Cal.* 2d 499, 55 *Cal. Rptr.* 401, 405, 421 *P.* 2d 409, 413 (Sup. Ct. 1966).

For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests * * *. (*Perry v. Sindermann*, 408 *U. S.* 593, 597, 92 *S. Ct.* 2694, 2697, 33 *L. Ed.* 2d 570, 577 (1972)).

Accord, *DeStefano v. Wilson*, 96 *N. J. Super.* 592, 598 (Law Div. 1967); *Bagley v. Washington Township Hospital District, supra.* States may not penalize the exercise of rights guaranteed by the Constitution. *Harman v. Forssenius*, 380 *U. S.* 528, 540–541, 85 *S. Ct.* 1177, 1185, 1186, 14 *L. Ed.* 2d 50, 58–59 (1965).

An analogous question to that before this Court was passed upon in *Ector v. City of Torrance*, 28 *Cal. App.* 3d 293, 104 *Cal. Rptr.* 594 (Ct. App. 1972), rev'd, 10 *Cal.* 3d 129, 109 *Cal. Rptr.* 849, 514 *P.* 2d 433 (Sup. Ct. 1973), *cert.* denied, 415 *U. S.* 935, 94 *S. Ct.* 1451, 39 *L. Ed.* 2d 493 (1974). While the residence requirement was struck down by the Court of Appeal, it was upheld by the California Supreme Court. The Torrance City Charter provided that all officers and employees of the City be residents or become residents within six months of their appointment or date of employment. An exception was provided for those with technical, special or professional knowledge or abilities. In applying the compelling state interest test of *Shapiro,* the Court of Appeal did not find sufficient justification for an impingement upon the "right of freedom to travel beyond the boundaries of the city for residential purposes." 104 *Cal. Rptr.* 594, 598. The court relied on *Purdy & Fitzpatrick v. State, supra,* 79 *Cal. Rptr.* 77, 456 *P.* 2d 645 (Sup. Ct. Cal. 1969). In declaring the unconstitutionality of a statute prohibiting the employment of aliens in public works, the *Purdy* court noted that the state may not condition public employment upon a waiver of constitutional rights. In order to avoid offending the equal protection provision of the Fourteenth Amendment, the state must establish that the classification constitutes a necessary means of accomplishing a legitimate state interest, *Loving v. Virginia,* 388 *U. S.* 1, 87 *S. Ct.* 1817, 18 *L. Ed.* 2d 1010 (1967), and that the law serves a compelling state interest, *Shapiro v. Thompson.*

In reversing the holding of the Court of Appeal in *Ector,* the Supreme Court of California first relied upon a specific

directive in the state constitution providing for charter cities, such as Torrance, to prescribe "qualifications" for employees. Such a constitutional right is not existent in New Jersey. Secondly, as to the federal constitutional claim, the court held that the right to travel did not include what it termed a "right to commute." It therefore applied the rational basis test, citing *Kennedy v. City of Newark* (109 *Cal. Rptr.* at 852, 514 *P.* 2d at 436). It also noted that "the cultural and educational rewards of international travel . . . are not reaped from routine daily trips of a harassed metropolitan commuter," citing *Kent v. Dulles,* 357 *U. S.* 116, 78 *S. Ct.* 1113, 2 *L. Ed.* 2d 1204 (1958). 109 *Cal. Rptr.* at 852, 514 *P.* 2d at 436.

It is an over-simplification, however, to characterize the right asserted herein as merely that of a "harassed commuter." "It is the exercise of that initial right to migrate to a new location which the employee wishes to assert, not that of daily travel to the municipality." *Goldstein, supra,* 7 *U. San Fran. L. Rev.* at 527.

While attempting to clarify the impact on travel required to invoke the compelling state interest test, the Court, in *Memorial Hospital v. Maricopa County, supra,* cites the "perceptive opinion" in *Cole v. Housing Authority of City of Newport, supra,* in which a two-year residence requirement for applicants for federally-aided low rent housing was declared violative of the equal protection clause. The *Cole* court clarified what it felt was the Supreme Court's concept of travel.

* * * The Court apparently uses "travel" in the sense of migration with intent to settle and abide. *See* Note, Shapiro v. Thompson: Travel, Welfare and the Constitution, 44 N. Y. U. L. Rev. 989, 1012 (1969). Thus, laws that comparatively disadvantage persons traveling to take advantage of state benefits and then leaving are permissible under *Shapiro.* For example, the Court suggested that residency is a reasonable requirement for eligibility to receive welfare benefits but that the one-year waiting period was unconstitutional. *Shapiro, supra* at 636, 89 S. Ct. 1322, 22 L. Ed. 2d 600. Any residency requirement might be thought to penalize the right to travel if

"travel" is used in the sense of movement. A resident of Maine vacationing for a month in New Hampshire might be penalized for traveling if he could not obtain the benefits of a library card in New Hampshire during his vacation. Nevertheless, a residency requirement so "penalizing" that kind of travel is probably permissible under *Shapiro*. [Footnotes omitted.] (*Cole v. Housing Authority of City of Newport, supra,* 435 *F.* 2d at 811).

The question in *Cole,* as in *Shapiro,* was whether the residency requirement penalized persons because they have recently migrated to the locality. The residence requirement imposed by the Newark ordinance directly affects one's ability to "migrate with intent to settle and abide," while having no relationship to those taking temporary advantages of State benefits. If one works for a local government, the majority would allow the choice of where to settle to be made by the governing body, and not the individual. Such restrictions pose a clear threat to migration by causing a second dislocation when new arrivals or present employees find government work in a jurisdiction adjacent to that in which they have decided to settle.

In reversing the Court of Appeal decision in *Ector v. City of Torrance,* the Supreme Court of California misconstrued the law with respect to the necessity for impairment of constitutional rights.

\* \* \* Appellant need not necessarily prove he was wholly denied rights he now invokes, but he must at least show that his exercise of those rights was actually and significantly impaired. (10 *Cal.* 3d at 136, 109 Cal. Rptr. at 853, 514 *P.* 2d at 437).

It is a "fundamental misunderstanding of the law" to require actual and significant impairment of the right to travel. *Dunn v. Blumstein, supra,* 405 *U. S.* at 339, 92 S. Ct. at 1001, 31 *L. Ed.* 2d at 283. *Shapiro v. Thompson* did not rest upon a finding that the denial of welfare actually deterred travel nor, historically, have other right to travel cases relied upon the presence of actual deterrents. *Dunn v. Blumstein,* 405 *U. S.* at 339–340, 92 S. Ct. at 1001–1002, 31 *L. Ed.* 2d at 282–283. In *Shapiro v. Thompson,* 394 *U. S.*

at 634, 89 S. Ct. at 1331, 22 *L. Ed.* 2d at 615, the Court stated that "any classification which serves to *penalize* the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional." (Emphasis original.) See *Eggert v. City of Seattle, supra,* 505 *P.* 2d at 805.

Similarly, the Court in *Memorial Hospital v. Maricopa County, supra,* 415 *U. S.* at 257, 94 S. Ct. at 1082, 39 *L. Ed.* 2d at 314, noted that denial of nonemergency medical care may very well inhibit an indigent from migrating to the "clean dry, air of Arizona, where relief from his disease could also bring relief from unemployment and poverty." The fact that one *may* hesitate to travel because of the inability to fall back on the state for medical care was held to be a sufficient penalizing within *Memorial Hospital v. Maricopa County.* In the case now before us, Mrs. Abrahams is being told that she can exercise her right to migrate beyond the city limits only on penalty of loss of her employment. It is difficult to imagine more direct evidence of a penalty to deter travel.

The City's position is essentially that expressed in *Kennedy v. City of Newark, supra,* to the effect that residence supplies a necessary incentive for better performance of employees and increased concern for the community. Newark notes in its brief that it, like many urban centers, is plagued by a myriad of social ills, including inadequate housing, schools and health care, as well as high crime and unemployment levels. While these problems are not to be minimized, penalizing resident employees for moving beyond a municipality's boundaries and barring nonresidents from employment are not constitutionally permissible alternatives. Our outlook must be less parochial in range.

Quoting Chief Justice Weintraub, the Supreme Court of California framed the question before them in *Ector v. City of Torrance,* as follows:

The question is not whether a man is free to live where he will. Rather the question is whether he may live where he wishes and at the same time insist upon employment by government. * * *. (10 *Cal.* 3d at 136–137, 109 Cal. Rptr. at 853, 514 *P.* 2d at 437 quoting *Kennedy v. City of Newark, supra,* 29 *N. J.* at 183).

I respectfully disagree. The question is not whether a man, having chosen a place to live, may insist upon employment by a government, but rather, whether the government may compel an individual to live within its boundaries as a condition of continued employment.

[T]he question before this Court is not whether a man has a right to be a policeman or fireman and simultaneously insist upon his right to live where he wishes, but rather whether the interests of a municipality in asking a policeman or fireman to surrender his constitutional right to travel and migrate in exchange for his job are sufficiently compelling to justify the creation of a working class of immobiles. [Footnote omitted.] (*Krzewinski v. Kugler, supra,* 338 *F. Supp.* at 499).

City employees must choose between living outside Newark or retaining their jobs with the city. They may not do both. The ordinance penalizes the exercise of that initial right to migrate.

I fail to see the state interest involved herein as sufficiently compelling to justify the broad and all inclusive limitations imposed on families in not allowing them to travel where they choose. That the residence ordinance now before this Court is a potential deterrent that would clearly penalize the right to travel to a substantial degree, is clear. *Donnelly v. City of Manchester, supra,* 274 *A.* 2d at 791; *Krzewinski v. Kugler, supra,* 338 *F. Supp.* at 498.

I would hold the ordinance unconstitutional as an impermissible restriction on the right to travel in the absence of a sufficiently compelling state interest.

## II

I agree with the majority insofar as it holds the "special circumstances" exception of the ordinance void in the ab-

sence of any standards whatsoever to guide the discretion of officials in its application. Unlike the majority, however, I would strike down the entire ordinance on the basis of this unconstitutional section.

The Newark ordinance does not contain a severability clause. Even where such a clause is present and one section of an ordinance is declared invalid, the ordinance may be invalidated *in toto* if "without such an escape hatch the municipality might have adopted an entirely different ordinance." *Dallenbach Sand Co. v. Mayor, etc., So. Brunswick Twp.,* 90 *N. J. Super.* 218, 221 (App. Div. 1966). Absent a severability clause, "it is to be presumed that the Legislature intended the act to be effective as an entirety." *State v. Doto,* 10 *N. J.* 318 (1952) ; *Riccio v. Hoboken,* 69 *N. J. L.* 649, 662 (E. & A. 1903). See *Bd. of Com'rs, Ridgefield Pk. v. A. S. Pater Realty Co.,* 73 *N. J. Super.* 155, 161 (Ch. Div. 1962). This alone, however, is not determinative of the issue. As stated by this Court in *Angermeier v. Sea Girt,* 27 *N. J.* 298, 311 (1958) :

The principle of separability is in aid of the intention of the lawgiver. The inquiry is whether the lawmaking body designed that the enactment should stand or fall as a unitary whole. It is not enough that the act is severable in fact; its severability in the event of partial invalidity must also have been within the legislative intention. It is a question of interpretation and of legislative intent whether the particular provision is so interwoven with the invalid clauses as that it cannot stand alone. A severability clause (there was none such here) "provides a rule of construction which may sometimes aid in determining that intent. But it is an aid merely ; not an inexorable command." *Dorchy v. State of Kansas,* 264 *U. S.* 286, 44 *S. Ct.* 323, 68 *L. Ed.* 686 (1924). Absent such express declaration, an unconstitutional provision of a statute does not affect the validity of another provision of the enactment, if otherwise valid, unless the two are so intimately connected and dependent upon each other as to raise the presumption that the Legislature would not have adopted the one without the other. Where the principal object of the statute is constitutional and the objectionable feature can be excised without substantial impairment of the general purpose, the statute is operative except in so far as it may contravene fundamental law. *St. John The Baptist Greek Catholic Church of Perth Amboy v. Gengor,* 121 *N. J. Eq.* 349 (E. & A. 1937) ; *State v. Doto,* 10 *N. J.* 318 (1952).

The question then is, given the presumption of an intention that the act be effective as an entirety, whether the "special circumstances" exception is so intimately related to the whole ordinance that its excision will substantially impair the general purpose of the enactment. The ordinance first requires that all officers and employees of the Board of Commissioners be residents of the City of Newark, subject of course to statutory exceptions. The second section of the ordinance grants the director of any department authority to .waive compliance with the residency requirement for reasons of (1) health, (2) nature of employment, and (3) special circumstances. The first two exceptions are very specific. The third exception, which the majority today declares void for vagueness, could refer to any number of reasons for nonresidence, including professional or technical ability, housing shortages, or personal problems and gives the department directors broad areas of discretion. To remove this area of discretion from the director of any department while retaining the ordinance would be to confine exceptions to health and nature of employment. However, absent the unfettered discretion which the "special circumstances" clause creates, and in view of the presumption that it was to be viewed in its entirety, the ordinance is a restrictive regulation differing in nature and effect so substantially from that enacted as to justify striking down the whole ordinance. *Washington National Ins. Co. v. Bd. of Review,* 1 *N. J.* 545 (1949) ; *Bd. of Com'rs. v. A. S. Pater Realty Co., supra,* 73 *N. J. Super.* at 160–162.

### III

A failure to prosecute others. because of lack of knowledge is not sufficient to sustain an allegation of discriminatory enforcement. *Oyler v. Boles,* 368 *U. S.* 448, 456, 82 *S. Ct.* 501, 506, 7 *L. Ed.* 2d 446, 452 (1962) ; *Kennedy v. City of Newark, supra,* 29 *N. J.* at 192. Even the conscious exercise of some selectivity in enforcement is not necessarily a constitutional violation. *Oyler v. Boles, supra,* 368 *U. S.* at

456, 82 S. Ct. at 506, 7 *L. Ed.* 2d at 453. This is not a situation, however, where I can join with the majority in finding the absence of "any evidence of a deliberate policy of non-enforcement by the directors of other city departments, or by the city administration as a whole. . . ." One cannot seriously contend that this record is "barren of proof" as was the case in *Kennedy v. City of Newark, supra,* 29 *N. J.* at 192. The majority concedes that of appellant's random sampling of 142 city employees, a full 15% (21) were found to be nonresidents in apparent violation of the ordinance. At no point in the briefs or at oral argument was it demonstrated that any city-wide procedures existed either for the enforcement of the ordinance or the granting of exemptions. No city-wide directives or instructions were ever circulated. Enforcement was pursued solely within the law department.

Failure to enforce an ordinance does not in and of itself preclude subsequent enforcement. *Kennedy v. City of Newark, supra,* 29 *N. J.* at 191. In *Kennedy,* however, there was no evidence of a studied policy not to enforce the ordinance and no evidence of official knowledge of violations. Such is not the case here.

The "missing link" of *Kennedy v. City of Newark* is present here: official knowledge of violations of the ordinance. *Kennedy v. City of Newark, supra* at 192. The City's records speak for themselves. It can hardly be contended that the City was unaware of other violations when the City's records show that in a random sampling, more than 15% of City employees were in violation of the ordinance.

The presumption of validity of municipal ordinances may be overcome only by a clear showing of arbitrariness or unreasonableness. *Kozesnik v. Montgomery Twp.,* 24 *N. J.* 154, 167 (1957). But, as Justice (then Judge) Hall noted in *Edelstein v. Asbury Park,* 51 *N. J. Super.* 368, 390 (App. Div. 1958): "The absence of corrupt motive, or even the presence of good faith, does not alone preclude judicial ex-

amination or remedy." Appellant has made an offer of proof as to Newark's discriminatory enforcement by this sampling.

Circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as "a mere preponderance of probabilities, and, therefore, a sufficient basis for decision." *Jackson v. Delaware, L. & W. R. Co.*, 111 *N. J. L.* 487 (*E. & A.* 1933). As there said, it need not have the quality of certainty, but it must be a presumption grounded in reason and logic; mere guess or conjecture cannot be substituted for legal proof. The burden of persuasion is not sustained unless the evidence demonstrates the offered hypothesis as a rational inference, that is to say, a presumption grounded in a preponderance of the probabilities according to the common experience of mankind. It is not easy to lay down with precision the line of demarcation between a just and reasonable inference and mere conjecture or surmise. The accepted standard of persuasion for the triers of the facts is that the determination be probably founded in truth. A bare quantitative preponderance is not enough. The evidence must be such in quality as to lead a reasonably cautious mind to the given conclusion. The measure of the weight of the evidence is "the feeling of probability which it engenders." *Bornstein v. Metropolitan Bottling Co.*, 26 *N. J.* 263 (1958), citing *Wigmore on Evidence* (3d ed.) § 2498. See *Sivak v. City of New Brunswick*, 122 *N. J. L.* 197 (*E. & A.* 1939).
    (*Joseph v. Passaic Hospital Ass'n*, 26 *N. J.* 557, 574–575 (1958)).

Appellant's showing of a 15% violation rate combined with Corporation Counsel's admitted efforts at enforcement solely within the law department raise the inference that the City's enforcement efforts were so arbitrary as to constitute discrimination in derogation of appellant's rights under the equal protection clause. Once appellant had established the inference of nonenforcement coupled with knowledge by City officials, it is not the employee's burden to come forward with conclusive data, but the City is obligated to show what is within its control and expertise, *i. e.*, that the ordinance was being fairly enforced and its officials in fact had no knowledge of violations.

The time for admonitions and warnings of future enforcement was after *Kennedy v. City of Newark*. The statement in the majority opinion to the effect that City officials "may in the past have disqualified nonresident applicants for

City employment" is a belated attempt to meet the burden of proof which the City has failed to sustain. That the majority cautions the City against taking today's holding as an "excuse for continued nonenforcement" is a sorry apology for leveling constitutional barriers against impingement of the right to travel and the right to the equal protection of the laws.

I would reverse the decision of the Civil Service Commission and hold the Newark Residence Ordinance unconstitutional.

*For affirmance*—Justices HALL, SULLIVAN and CLIFFORD and Judges CONFORD and COLLESTER—5.

*For reversal*—Justice PASHMAN—1.